Irving L. GARTENBERG, Plaintiff,

v.

MERRILL LYNCH ASSET MANAGE-
MENT, INC., Merrill Lynch, Pierce,
Fenner & Smith Incorporated, and Mer-
rill Lynch Ready Assets Trust, Defend-
ants.

Simone C. ANDRE, Plaintiff,

v.

MERRILL LYNCH READY ASSETS
TRUST and Merrill Lynch Asset
Management, Inc., Defendants.

Nos. 79 Civ. 3123(MP), 79 Civ. 5726(MP).

United States District Court,
S. D. New York.

Dec. 28, 1981.

Pomerantz, Levy, Haudek & Block, by Stanley M. Grossman, Stephen P. Hoffman, Bruce G. Stumpf, New York City, for plaintiff Irving L. Gartenberg.

Silverman & Harnes, by Sidney B. Silverman, Joan T. Harnes, Martin H. Olesh, New York City, for plaintiff Simone C. Andre.

Brown, Wood, Ivey, Mitchell & Petty, by James B. May, James K. Manning, A. Robert Pietrzak, New York City, for defendant Merrill Lynch Ready Assets Trust.

Rogers & Wells by William P. Rogers, Stanley Godofsky, James N. Benedict, Anne D. Neal, New York City, for defendants

Merrill Lynch Asset Management, Inc. and Merrill Lynch, Pierce, Fenner & Smith Inc.

## FINDINGS AND OPINION

MILTON POLLACK, District Judge.

### Preliminary

Over 1,100,000 persons and institutions were at the time of trial herein shareholders in a money market fund whose net assets at that time exceeded $19 billion, known as the "Merrill Lynch Ready Assets Trust" (the "Fund" hereafter). Two individual shareholders, Irving Gartenberg and Simone Andre, have brought this suit under Section 36(b) of the Investment Act of 1940, 15 U.S.C. Section 80a–35(b) (the "Act") complaining of the size of the annual compensation paid to the Fund's Investment Adviser in 1980–81 under its percentage contract with the Fund. The fee paid to the Adviser, "Merrill Lynch Asset Management, Inc." ("MLAM" hereafter) is contingent on the average daily value of the net assets of the Fund during the period; the annual compensation amounted to 0.288% or slightly above ¼ of one percent of those net assets.

The *Gartenberg* complaint names as defendants, i) the Fund, ii) MLAM, a wholly-owned subsidiary of Merrill Lynch & Co., Inc. ("Merrill Lynch"), which supplies the Fund with investment management, administration and required services, and iii) "Merrill Lynch, Pierce, Fenner & Smith Incorporated" (MLPF&S) another wholly-owned subsidiary of Merrill Lynch, which processes the vast bulk of the daily orders of the Fund's shareholders. The *Andre* complaint names only the Fund and MLAM as defendants.

There is no claim by the plaintiffs that the shareholders individually did not receive their money's worth from MLAM, i.e., that the services supplied were not worth the fractional percentage attributable to the net assets they had in the Fund. Rather, the plaintiffs claim that because of the size of the Fund, MLAM made too much money from the application of the agreed percentage.[1]

As of December 31, 1980, plaintiff Gartenberg held 986 shares (valued at $1 per share) of the Fund and plaintiff Andre held 2,850 shares and they have continued to hold those shares together with additional shares received daily as dividends.[2]

### The Fund and the Merrill Lynch organization

The Fund was organized in 1975 as an unincorporated business trust under the laws of Massachusetts and registered with the Securities and Exchange Commission ("SEC") as a diversified, open-end investment company. It is a no-load money market mutual fund (meaning that there is no cost to purchase its shares) and invests primarily in short-term money market securities.[3]

The Fund's Board of Trustees is comprised of eight Trustees, two of whom are "interested persons" as defined in the Act. The six "non-interested" or "unaffiliated" Trustees make up the Audit Committee of the Fund. The Fund has no employees of its own. Its business is conducted from the offices of MLAM as is the business of other Merrill Lynch investment companies.

MLAM, a Delaware corporation, has served as the Investment Advisor of the

---

1. The amount of the compensation at issue in these suits is the amount that MLAM has received during the year September 4, 1980 until September 4, 1981. This limitation is derived from the limitary period on the award of damages set by Section 36(b)(3) of the Act, 15 U.S.C. Sec. 80a–35(b) (1976). *See Gartenberg v. Merrill Lynch,* 79 Civ. 3123 (S.D.N.Y. Sept. 4, 1981) (granting plaintiffs' motion to amend and supplement their admittedly insufficient claim as of Sept. 4, 1981 on the basis of plaintiffs' said stipulation).

2. On or about December 1, 1980, during the pendency of this suit, a new account in the Fund was opened for J. M. Gartenberg under the Uniform Gift to Minors Act, and on January 6, 1981 additional shares were purchased for the account.

3. E.g., short-term United States Government securities, Government agency securities, bank certificates of deposit and bankers acceptances; short-term corporate debt securities such as commercial paper and variable amount master demand notes; and repurchase and reverse repurchase agreements.

Fund since June 1976. MLAM also acts as the investment adviser for four other mutual funds sponsored by Merrill Lynch. MLAM selects the Fund's investments and trades in money market securities for the Fund's account. MLAM performs or provides the administrative and management services for the Fund and provides the Fund with office space and facilities, equipment and personnel. It imports the services of its affiliate, defendant MLPF&S, the brokerage subsidiary of Merrill Lynch, to process the principal volume of the huge number of daily orders of the Fund shareholders for the deposit and withdrawal of money to and from the Fund. MLAM also provides investment management services to individuals and institutions. The services performed for the Fund by MLAM and its affiliates can be divided into three categories: portfolio management; general administrative services; and money market fund shareholder services.

The Merrill Lynch brokerage branch office system consists of 408 domestic offices in which its more than 7,000 account executives are located, all of whom are available to process shareholder orders and administer shareholder accounts for the Fund without any commission. An average of more than 30,000 shareholder orders *per day* are processed in that way by MLPF&S involving the purchase and redemption of shares of the Fund and other services. Much of the success of the Fund in terms of its acceptance by shareholders can be attributed to the fulsome shareholder service provided by that system.

In making its investment decisions, MLAM has access to the advice and expertise of all Merrill Lynch affiliates, and particularly Merrill Lynch Economics, Inc., Merrill Lynch Government Securities, Inc. and MLPF&S. The first of these affiliates provides basic economic research and forecasting; the second is one of the largest dealers in United States Government securities and Government Agency securities; and MLPF&S is the largest registered broker-dealer in the United States and provides fundamental research on bank and other corporate issuers.

The compensation attributable to the individual shareholder for the services provided by MLAM and its affiliates was far below the cost of any available alternative for similar service. The administrative services provided for the Fund by MLAM amply serve the Fund's requirements and go well beyond mere office matters. Substantial efforts are necessary to maintain compliance with SEC and state regulatory requirements, including recordkeeping and reporting requirements. MLAM renders these services to the Fund. Additionally Merrill Lynch Funds Distributor, Inc. (MLFD), which is a 100% owned subsidiary of MLAM, acts as distributor of Fund shares and maintains a staffed answer-telephone for inquiries from shareholders. MLFD has waived its right to commissions on the sale of Fund shares.[4]

*The Money Fund Industry and the Growth of the Fund*

Money market funds make available to small investors and short term cash depositors substantially higher interest rates than are obtainable through bank deposits. They offer redeemable participations in terms of shares in a portfolio of securities. The first such fund was started in 1972.

The money market fund industry has experienced extraordinary growth in the last few years. New money market funds have been sprouting up regularly—there is no difficulty in entering the field. In 1975, there were 32 money market funds. By 1978 there were 54 and today there are 139 [4a] such funds. The assets under management in all the money market funds have likewise grown enormously and dra-

4. The agreement between the Fund and MLAM's wholly-owned subsidiary, MLFD, permits the latter "to enter into selected dealer agreements with securities dealers of its choice." Pursuant to its contract with the Fund, MLFD has designated its affiliate, MLPF&S, as a dealer in Fund shares. MLPF&S has also waived commissions on the sale of Fund shares.

4a. N.Y. Times, Dec. 18, 1981, p. D9, at col. 4.

matically. In June 1978 there was a total of about $6.8 billion of assets in money market funds; today their assets total more than $185 billion—a 25-fold growth. The Fund involved herein is by far the largest money market fund in existence.

The principal reason for the prodigious growth of the Fund under MLAM's supervision, from $100 million to over $19 billion in just a few years, has been the spectacular surge in interest rates and the availability of the Merrill Lynch system to cope with the processing services required—to administer the dramatic growth of the Fund and to satisfy the daily orders and other demands of its shareholders. It was conceded by plaintiffs' expert that there is no adequate substitute readily available for the Merrill Lynch system to handle the Fund. The enormous gap between interest rates paid by banks and money funds renders the Fund an attractive short-term investment for high daily income returns, in a medium available without any cost to the customer to buy or sell the investment, by easy means of deposits and withdrawals in every geographical area of the United States (and beyond), subject to simple check withdrawals, as frequently as desired by the shareholder, with relative security of the principal meanwhile.

The net asset value of shares of the Fund remains constant at $1 per share and net income (including realized and unrealized gains and losses of the Fund's portfolio) is credited daily to shareholder accounts in the form of dividend shares declared daily. Thus, the fluctuations in the value of a shareholder's investment in the Fund are reflected in the number of shares held in the shareholder's account.

The deposits and withdrawals by participants in the Fund are somewhat euphemistically styled as purchases and sales of shares of the value of those deposits and withdrawals. In a very real sense, an account in a money market fund is more like a bank account than a traditional investment in securities; and unlike an equity stock investment or other types of securities. The funds in a money market fund are not tied up for a fixed or long time.

### The Investment Advisory Agreement

The Fund commenced operations on February 18, 1975 as the "Lionel D. Edie Ready Assets Trust". The initial investment advisory agreement provided for an advisory fee of 0.50% of the net average daily assets.[5]

MLAM was formed in 1976 as the investment management subsidiary of Merrill Lynch so that a single Merrill Lynch company could utilize the vast resources of the entire Merrill Lynch organization in determining and achieving the specific investment objectives of institutional portfolios.

On April 29, 1976, the Fund Trustees approved the first investment advisory agreement with MLAM. It provided for a schedule of contingent advisory fees starting with an annual charge of 0.50% of the first $500 million of average daily net assets, and followed by reduced percentages at a series of breakpoints as the net assets of the Fund increased. At the time the net assets of the Fund were just over $100 million. In June 1976, MLAM began acting as investment advisor to the Fund pursuant to their first advisory agreement, and the name of the Fund was changed to the "Merrill Lynch Ready Assets Trust".

The following year, on April 28, 1977, the Trustees approved continuance of the same investment advisory agreement. The Fund's assets were then approximately $288 million. One year later the assets of the Fund had grown to approximately $750 million, and MLAM proposed a revised fee schedule that would have continued the 1977 rates at existing breakpoints but would have added an additional breakpoint providing for an annual fee of 0.375% on assets in excess of $1 billion. The independent Trustees accepted MLAM's proposal to add a new breakpoint at the $1 billion level, but insisted on reducing the proposed fee

**5.** This initial agreement was with Edie Management Services, Inc. ("Edie"), not MLAM; in connection with the sale by Merrill Lynch of Edie's parent in 1976, a new investment advisory agreement was entered into between the Fund and the then newly-created MLAM.

rate to 0.425% and 0.375% on assets in excess of $500 million and $750 million respectively and to 0.35% at the new $1 billion level. Although MLAM was opposed to these revisions in its fee schedule, it accepted the Trustees' decision and on April 27, 1978, the Trustees approved an agreement containing the fee reductions as initiated by the independent Trustees.

During late 1978, the assets of the Fund increased substantially. On January 24, 1979, while the 1978 agreement was still in effect, MLAM again voluntarily reduced its fee by introducing two additional breakpoints at the $1.5 and $2 billion levels. These additional breakpoints reduced the advisory fee to 0.325% of assets over $1.5 billion and 0.30% of assets over $2 billion. At that time the Fund had net assets of approximately $2 billion.

The Fund continued to grow rapidly during 1979, and in May its assets reached $3.5 billion. On May 8, 1979, the Trustees approved an advisory agreement, which added yet another breakpoint at the $2.5 billion asset level.

The schedule of advisory fees payable to MLAM under the 1979 and subsequent agreements is set forth in the table below:

| Portion of average daily value of net assets: | Advisory Fee |
| --- | --- |
| Not exceeding $500 million | 0.50% |
| In excess of $500 million but not exceeding $750 million | 0.425% |
| In excess of $750 million but not exceeding $1 billion | 0.375% |
| In excess of $1 billion but not exceeding $1.5 billion | 0.35% |
| In excess of $1.5 billion but not exceeding $2 billion | 0.325% |
| In excess of $2 billion but not exceeding $2.5 billion | 0.30% |
| In excess of $2.5 billion | 0.275% |

This fee schedule was reviewed and approved by the Trustees of the Fund for another year on April 24, 1980, when the size of the Fund was $9.8 billion, and again on May 7, 1981, when the size of the Fund was $17 billion. At the trial date level of over $19 billion, the effective rate of the fee under the above schedule approximated 0.288%, or $2.88 annually for each $1,000

invested. This rate is among the lowest in the industry for a Fund of this type and, at the trial date level of the Fund, the average of the size of shareholders' accounts (approximately $15,500) incurs an annual charge, for advisory and deposit and withdrawal services, of about $45.

*Processing Orders for the Fund*

A Fund account may be opened at the option of the customer either through MLPF&S, the Broker affiliate, or directly through The Bank of New York, the Fund's custodian and transfer agent, which is under contract as such to the Fund. A depositor in the Fund has the option of placing orders to purchase or redeem shares of the Fund through the Broker or directly through the transfer agent.

MLPF&S (the Broker affiliate) during the period under review received and processed approximately 80% of the orders for purchases of shares made by the shareholders of the Fund. When an investor purchases or redeems shares of the Fund through the Broker, such transactions are processed through a brokerage account with the Broker which is opened either specifically for purposes of deposits in the Fund, i.e., purchase of Fund shares, or through an account previously opened in connection with transactions in other securities. No charge is made to the Fund's customer for accepting the deposit, opening and maintaining the securities brokerage account, or for the shares obtained by the deposit, or for redemptions, even if an account is opened and utilized solely for purposes of transactions in Fund shares. Orders for the purchase or redemption of Fund shares placed through the Broker are transmitted from the branch offices by wire to computer facilities and administrative personnel in the Merrill Lynch home office.

*Plaintiffs' Contentions*

Plaintiffs claim that Congress intended to limit the fees of Advisers to fair charges and that the compensation to MLAM is unreasonably high and disproportionate to the services rendered and their costs.

Plaintiffs offer as an apt comparison for the compensation payable by the Fund, the compensation (unspecified) that pension fund managers are paid which plaintiffs say is only a fraction of the compensation which the Fund pays. Turning from the price paid by the Fund, the plaintiffs claim that the costs of servicing the contract by MLAM should be considered in evaluating the fairness of its compensation but should not include the expense incurred by MLAM's affiliate, MLPF&S, in the handling of the service requirements of the Fund investors and shareholders. They claim that the Broker is "unnecessarily" rendering such services and that the Transfer Agent, The Bank of New York, is allegedly capable and should perform them. They claim that the fall-out benefits to the Broker from opening accounts and servicing the money market fund needs of the investors should be considered as an offset to the expense of the Broker in processing the orders of the shareholders of the Fund. Additionally, plaintiffs attack the studies made of the costs of those services, studies made by Merrill Lynch staff as well as by independent cost accounting experts, which quantified the processing costs; they characterize those studies as improperly performed and vastly overstating the real expense incurred. Plaintiffs add, that at all events, such expenses in reality should be considered as a cost of distribution of securities and in their view, the federal statute and regulations do not permit a mutual fund to pass along such an expense to the shareholders.

Plaintiffs also challenge the approvals of the fees to MLAM by the Trustees and the shareholders of the Fund and assert that in considering whether the compensation received was in breach of fiduciary duty, no weight should be given by the Court to their respective approvals of the advisory fee, because the Trustees allegedly failed to consider critical facts and allegedly were misled and because the shareholders were not provided with correct or adequate information on which to make a knowledgeable ratification.

A critical examination of the actual and relevant facts concerning the issue of whether the compensation received by MLAM constituted a breach of fiduciary duty exposes the unreality and invalidity of each of plaintiffs' contentions.

*The Statute*

Section 36(b) of the Investment Company Act of 1940 provides that

"the investment adviser ... shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser."

The statute expressly provides that "plaintiff shall have the burden of proving a breach of fiduciary duty." [6]

Section 36(b) was added to the Act in 1970. Its enactment was precipitated as the result of the abuses which Congress had perceived with respect to equity load funds during the 1960's. *See generally* S.Rep.No. 184, 91st Cong., 1st Sess., accompanying S. 2224, *reprinted in* [1970] U.S. Code Cong. & Ad. News 4897 [hereinafter *"Senate Report"*]. Money market funds were not in existence at that time. It seems clear from that fact that Congress had in mind front-end load equity funds and not today's money market funds which are no-load and in which a shareholder can redeem his shares without the payment of any penalty or tax consequences, and freely invest his funds without expense, on virtually the same terms, in any one of the large number of other funds available in the market place.

---

6. At common law it was incumbent on the fiduciary to justify his transaction with his cestui. Under this statute the burden is reversed. Indeed, the Report by the House Committee even considered a burden of proof "by clear and convincing evidence ... in order to attempt to eliminate nuisance suits designed to harass defendants." H.R.Rep.No. 1382, 91st Cong., 2d Sess. 38 (1970) [hereinafter *"House Report"*].

■ The basic contention of plaintiffs in these cases is that MLAM is making "too much" money and that this, in and of itself, constitutes a violation of the fiduciary duty imposed upon investment advisers by Section 36(b). However, Congress explicitly, recognized "the fact that the investment adviser is entitled to make a profit. Nothing in the bill is intended to imply otherwise ..." *Senate Report* at 6, U.S. Code Cong. & Admin. News 1970, p. 4902. The price charged for the service is the key fact—the cost to the fiduciary of rendering the service is of relative unimportance.

Congress has made it very clear in the legislative history that it rejected any concept that Section 36(b) should impose a "cost plus" basis as a standard or that the Court should engage in rate-making.[7]

The Senate Report cited above accompanying the 1970 amendments makes it evident that Congress did not intend the Courts to "second-guess" the business judgment of the independent trustees with respect to the size of the investment advisory fee:

*Nothing in the bill is intended to ... suggest that a "cost-plus" type of contract would be required. It is not intended to introduce general concepts of rate regulation as applied to public utilities.*

 \* \* \* \* \* \*

This section is *not intended to authorize a Court to substitute its business judgment for that of the mutual fund's board of directors* in the area of management fees.

 \* \* \* \* \* \*

Th[is] section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary. *Senate Report* at 6–7, U.S. Code Cong. & Admin. News 1970, p. 4902. (Emphasis supplied).

As one commentator pointed out, Congress moved away from testing the amount of the compensation and focused instead on the adviser's conduct:

The deletion of the reasonableness standard and substitution of the adviser's fiduciary obligation changed not only the standard of judicial review but the method for testing management's compensation. The test no longer modified the fee in Sec. 15 but was made part of the adviser's duties under Sec. 36.

Nutt, *A Study of Mutual Fund Independent Directors*, 120 U.Pa.L.Rev. 179, 190 n. 61 (1971).

The Second Circuit, in its opinion affirming this Court's decision to strike plaintiff's jury demand, specifically adopted the Pennsylvania Law Review analysis:

The original bills introduced in the Senate and the House provided that the propriety of charges should be determined by the test of "reasonableness". (Citations omitted). Influenced in part by industry opposition to the "reasonableness" standard, Congress shifted, to the standard of "fiduciary duty" that is in the present act.

*In re Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981).

The Congress was not precise in delineating the test for compliance with the fiduciary standard by which to judge the acceptability of compensation to a money market fund advisor. The fiduciary standard "imposes a high degree of legal commitment to treat the fund with utmost fairness." 116 *Cong.Rec.* 33282 (1970) (remarks of Rep. Springer.) Some members of Congress left open the possibility that in certain limited circumstances, the fee, considered by itself, might be enough to prove a breach of the Section 36(b) standard. Senator Bennett, in his remarks on the bill, stated that the section authorized lawsuits "in the event that the fee received is claimed to be so *excessive* as to constitute a breach of fiduciary duty." 115 *Cong.Rec.* 13693 (1969) (em-

---

**7.** Congress has twice declined to pass legislation which would have imposed a "reasonableness" standard. Bills introduced in the House and Senate in 1967 and 1968 would have re- quired advisory fees to be "reasonable", but were never enacted. *See* S. 3724, 90th Cong., 2d Sess. (1968).

phasis added). In the House, Representative Moss stated that the duty was "a legal obligation to so administer and so charge the fund so that [the adviser] does not commit an *excess* against the fund." 116 *Cong.Rec.* 33281 (1970) (emphasis added).

While Congress rejected any attempt to rest the inquiry on what was "reasonable," it did not indicate that the common law standard of "corporate waste," which had previously been available to challenge advisory fees, was to be disregarded as an element of the Court's inquiry.[8] The Senate committee explicitly "decided [only] that the standard of 'corporate waste' [was] unduly restrictive." *Senate Report*, at 5, U.S. Code Cong. & Admin. News 1970, p. 4901. Section 36(b) was an attempt to strengthen, not erode, that standard. *See Tannenbaum v. Zeller*, 552 F.2d 402, 416 n.20 (2d Cir. 1977), *cert. denied* 431 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Herzog v. Russell*, 483 F.Supp. 1346, 1349 n.1 (E.D.N.Y.1979).

Specific purposes to be served under Section 36(b) were stated in the legislative history and these may be summarized as follows. These purposes serve as the only congressional guide to the principles of the judicial review of compensation obtained by a fiduciary of a money market fund.

*The Intention of the Legislation*

1. What *is* intended:

(a) That the investment adviser is entitled to make a profit.

2. What *is not* intended:

(a) That a cost-plus type of contract is required.

(b) That general concepts of rate regulation as applies to public utilities are to be introduced.

(c) That the standard of "corporate waste" is to be applied.

(d) That management fees should be tested on whether they are "reasonable".

(e) That a congressional finding has been made that the present industry level or that the fee of any particular adviser is too high.

(f) That the Court is authorized to substitute its business judgment for that of the directors.

(g) That the responsibility for management is to be shifted from directors to the judiciary.

(h) That economies of scale are necessarily applicable at every stage of growth of the Fund.

3. The test of fairness is *to be made* by the Court, in part:

(a) By reference to industry practice.

(b) By reference to industry level of management fees.

4. The Court shall determine *whether*

(c) The attention of directors was fixed on their responsibilities.

(d) The directors requested and obtained information reasonably necessary to evaluate the terms of the management contract.

(e) The directors having the primary responsibility for looking after the best interests of the Fund's shareholders, have evaluated such information accordingly.

The net intent of the legislation to the extent it was expressed would seem to leave it to the federal courts to interpret compliance with "fiduciary duty" in the common law tradition (in this case "federal common law", really federal equity jurisprudence). Thus viewed, Section 36(b) represents a political compromise of a highly emotional nature which eschews rate regulation for personal services but nonetheless caps compensation at market acceptability accompanied by good faith and fair disclosure of that range.

An examination of the case authorities also fails to illumine precisely the path to be followed by the Court in weighing the compensation of the investment adviser of a money market fund under fiduciary standards. Only general concepts have been articulated. The standard of fiduciary duty

---

**8.** *See, e.g., Saxe v. Brady*, 40 Del.Ch. 474, 184 A.2d 602 (1962); *Meiselman v. Eberstadt*, 39 Del.Ch. 563, 170 A.2d 720 (1961); *Acampora v. Birkland*, 220 F.Supp. 527 (D.Colo.1963).

under Section 36(b) "is concerned solely with fairness and equity." *In re Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980), *cert. denied*, 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981). "The essence of the [fiduciary] test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain." *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939).

The conduct of the investment adviser must be governed by the "duty of uncompromising fidelity" and "undivided loyalty" to the Fund's shareholders that is imposed by Section 36(b). *Galfand v. Chestnutt*, 545 F.2d 807, 809, 811 (2d Cir. 1976). For example, the investment adviser because he is a fiduciary, may not sell his office for personal gain. *Rosenfeld v. Black*, 445 F.2d 1337, 1342 (2d Cir. 1971), *cert. dismissed* 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972). When "endeavoring to influence the selection of a successor," a fiduciary must act "with an eye single to the best interests of the beneficiaries." *Id.* Moreover, it is well settled that the investment adviser owes a duty of full disclosure to the trustees and shareholders of the Fund. *Galfand*, 545 F.2d at 811. *See Tannenbaum v. Zeller*, 552 F.2d 402, 417 (2d Cir.), *cert. denied*, 431 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977) (Sec. 36(a)); *Fogel v. Chestnutt*, 533 F.2d 731, 750 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Moses v. Burgin*, 445 F.2d 369 (1st Cir. 1971), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971). And even when full disclosure has been made, the courts must "subject the transaction to rigorous scrutiny for fairness." *Galfand*, 545 F.2d at 811–12; *Krasner v. Dreyfus Corp.*, 90 F.R.D. 665 (S.D.N.Y.1981).

*The Fairness of the Advisory Fee*

■ In determining whether MLAM has breached its fiduciary duty, this Court must primarily examine what the Fund paid and what it received. The Court must consider the "nature, quality and extent" of the services to the Fund in relation to the fee paid by the Fund. Note, *Mutual Fund Advisory Fees—Too Much for Too Little?* 48 Fordham L.Rev. 530, 545 (1980). *Accord, Krasner v. Dreyfus Corp.*, 500 F.Supp. 36 (S.D.N.Y.1980). Congress intended

that the court look to all facts in connection with the determination and receipt of such compensation, including all services rendered to the fund or its shareholders and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as a fiduciary in relation to such compensation. *Senate Report*, at 15, *House Report*, at 37, U.S. Code Cong. & Admin. News 1970, p. 4910.

The legislation permits the Court to give such weight as it may allow to the approval of the investment advisory agreement by the trustees and shareholders of the Fund.

■ It bears repeating that in order to provide relief under Section 36(b), it is not enough for this Court to find that a better bargain was possible. Instead, plaintiffs can prevail only if this Court finds that MLAM received compensation under an agreement that was *unfair* to the Fund and its shareholders.

A. *The Nature, Quality and Extent of the Services Provided in Relation to the Fee Paid.*

1. *The services provided*

Merrill Lynch provides three types of services to the Fund. MLAM manages the Fund's portfolio and has important administrative functions, while MLPF&S, under a contractual arrangement with MLFD, provides the overwhelming bulk of shareholder services.

Plaintiffs contend that MLAM's performance in managing the Fund's portfolio has been "only fair." Defendants counter that the Fund's performance has been "substantially above average."

According to *Donoghue's Money Fund Report*, whether all money market funds are considered, or only stockbroker-sponsored funds, the Fund's yield has been

above average for 1978, 1979, and 1980.[9] For 1980, in terms of its yield, the Fund ranked 37th out of all 76 money funds and 10th out of the 22 stockbroker-sponsored money funds.

These figures are not entirely inconclusive. While the Fund's performance, as measured by its yield, has not been spectacular, neither has it been disappointing. The Fund's performance assures its customers that they may safely take advantage of the high interest rates afforded by money market instruments without fear that their return will be below the industry average.

Pursuant to the investment advisory agreement, MLAM furnishes to the Fund "office space and all necessary office facilities for managing the affairs and investments and keeping the books of the [Fund]." MLAM is responsible for the Fund's compliance with all the applicable record-keeping and reporting requirements of federal securities and state Blue Sky laws. Moreover, MLAM coordinates the operation of the various entities that perform services for the Fund, such as the accountant, Transfer Agent and Broker. Neither plaintiff has denied that MLAM has been fully competent in performing these general administrative services, despite the unprecedented size of the Fund.

It is the shareholder services provided to Fund shareholders by MLPF&S that distinguish it from its competitors in the money market industry. Under section 7 of the distribution agreement, MLFD entered into a selected dealer agreement with MLPF&S. As a result, the vast facilities of the Broker are available to transmit and process Fund orders.

In particular, any one of the MLPF&S account executives can enter a shareholder's order to purchase or redeem Fund shares, and can provide information concerning the Fund's current yield and the status of the shareholder's account over the telephone. Moreover, the account executive can arrange to invest funds in the Fund or redeem shares overnight, and can place idle money in the Fund for as little as one day.

MLPF&S has continued to provide these services and the number of Fund orders processed through the Broker has almost doubled from 1979 to 1980. Indeed, during the first six months of 1981 the rate at which orders were processed was nearly 3¾ times the 1979 rate.[10]

### 2. The fee paid

In return for these services, the Fund pays MLAM a fee according to a schedule that is the subject of the present suit. In evaluating this fee, it must be recognized that the Fund is by far the largest money market fund in existence, and has been so during the period with which this suit is concerned.[11] In such a situation, industry comparisons can never be entirely persuasive. Even with this caveat in mind, MLAM's fee compares very favorably with others in the industry. First of all, the Fund pays one of the lowest effective rates of any money market fund. At current asset levels, the effective fee is less than 0.29%, or less than $2.90 for every $1,000 invested in the Fund.[12] Moreover, the

**9.** 

| Type of Fund | Average Yield (%) | | |
| --- | --- | --- | --- |
| | 1978 | 1979 | 1980 |
| The Fund | 7.24 | 10.61 | 12.09 |
| All Stockbroker-sponsored | 7.08 | 10.59 | 12.03 |
| All Funds | 7.00 | 10.55 | 11.94 |

Figures for the current calendar year are not supplied in the record.

**10.** In 1979, 2,486,792 Fund orders were processed through the Broker. In 1980, the number of orders almost doubled, to 4,949,200. In the first six months of 1981, 4,646,800 orders were processed.

The difficulty of planning for such increases is exacerbated by the fact that the rate of increase is unstable. In eight of the twelve months of 1980, for example, the rate of change in Fund orders changed by nearly ten percentage points or more.

**11.** At the time of trial, the Fund had triple the net assets of the next largest fund not sponsored by Merrill Lynch.

**12.** The record shows that as of March 4, 1981, only the Temporary Investment Fund, which had an effective rate of 0.231%, was charging at a lower rate than the Fund. The Union Cash

Fund's ratio of expenses to average net assets is in line. At least 16 funds of all types had higher expense ratios, while five had lower ratios.

### 3. *The net earnings as a result of providing the services*

The price that the market will pay for the services involved is a principal consideration in evaluating its fairness. Costs of the services enter into the determination of the price to be demanded by the Adviser, but price to the Fund is critical, not cost to the supplier. The competitive price in the market is what sells the services; cost to the Adviser is not the way the service is sold.

Plaintiffs contend that direct costs to MLAM, including personnel costs, bookkeeping and office supplies, only, may properly be considered in determining whether the fee is fair. They contend, moreover, that the costs incurred by MLPF&S associated with the opening of a Fund account and in providing the shareholder services that are one of the most distinguishing features of the Fund, may not properly be considered, because MLPF&S is not obligated to perform them.

Nothing in Section 36(b) obligates this Court, in assessing the fairness of the investment advisory compensation, to restrict its vision only to those services performed directly by MLAM. Indeed, the statute recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another. The statute itself speaks of payment for the services of the advisor "or any affiliated person of such investment adviser." 15 U.S.C. Sec. 80a–35(b) (1976). As both the Senate and the House reports stated:

> [I]t is intended that the court look at all the facts in connection with the determination and receipt of such compensation, *including all services rendered to the fund or its shareholders* and all compensation and payments received, in order to reach a decision as to whether the adviser has properly acted as fiduciary in relation to such compensation. *Senate Report* at 15; *House Report*, at 37, U.S. Code Cong. & Admin. News 1970, p. 4910.

That the courts are not required blindly to adhere to corporate organization when there is no reason to do so also follows from the equitable nature of their task under Section 36(b). Equity has traditionally refused to be hemmed in by rigid boundaries; on the contrary, equitable powers are inherently flexible. "Equity always attempts to get at the substance of things, and to ascertain, uphold, and enforce rights and duties which spring from the *real* relations of parties." 1 J. Pomeroy, *A Treatise on Equity Jurisprudence* Sec. 378 (4th ed. 1918).

In this case, both MLAM and MLPF&S are wholly-owned by Merrill Lynch & Co., Inc. MLPF&S has a selected dealer agreement with the Fund's Distributor which authorizes it to process Fund orders. Most importantly, MLPF&S provides Fund customers with convenient access to the Fund through the enormous Merrill Lynch brokerage system. It is undoubtedly as a result of the convenience to them that the customers select MLPF&S to process the overwhelming majority of Fund orders [13]

Management Fund, with an effective rate of 0.20%, is internally managed, and therefore cannot be properly compared.

**13.** Since June 1978, the number of orders for purchases and redemptions of Fund shares processed through the Broker and the Transfer Agent has been as follows:

and the Fund has become the largest of its kind in the world. And yet, since the investors are not charged a sales load for processing Fund orders, MLPF&S is not compensated directly for providing these shareholder services. There are significant advantages to purchasing and redeeming shares of the Fund through a securities brokerage account maintained with MLPF&S which are not available to individuals who process their transactions through the Transfer Agent. The flexibility available to an investor to swing from one form of investment to another, simply, efficiently and without cost is of considerable advantage to the Fund shareholder.

■ In sum, it appears that MLPF&S provides an essential portion of the total package of services that may properly be compensated by the advisory fee. Certainly Merrill Lynch's own internal actions demonstrate that it believed this to be the case, since for the past two years it has required MLAM to reimburse MLPF&S for estimates of its costs in processing Fund orders, based on the lowest internal estimates thereof.

In view of these considerations, the processing costs to MLPF&S may properly be considered in assessing the fairness of the compensation paid by the Fund.

### 4. Costs of providing the processing services

The record shows that the costs to MLPF&S of providing processing services to the Fund, though uncertain in amount, were substantial. There have been three basic estimates of the costs to MLPF&S of processing Fund orders, ranging from $2 to $7.50 per transaction. These studies were undertaken as a result of the exploding volume of orders that the Fund was experiencing.

The earliest estimate was calculated by Robert Diemer, an official with Merrill Lynch's Diversified Financial Services Group, which oversees Merrill Lynch's money funds. Using figures for the first quarter of 1979, Diemer combined the direct processing costs to MLPF&S (essentially the costs of entering and executing a Fund order) with an allocation for the costs of Merrill Lynch's branch offices, and concluded that it cost MLPF&S $5.06 for every Fund order it processed.[14]

Even though Diemer had stated earlier that any allocation of branch expenses "would be subjective at best," he concluded that an allocation of branch expenses based on MLAM revenue as a percentage of total Merrill Lynch "production credits" would be most appropriate.[15] Since MLAM revenue

| Orders processed for the Fund | | | |
|---|---|---|---|
| Date | By MLPF&S | | By Transfer Agent |
| 7/78 - 12/78 | 437,282 | | (not available) |
| 1979 | 2,486,792 | | (not available) |
| 1980 | 4,949,200 | (79.8%) | 1,253,773 (20.2%) |
| 1/81 - 6/81 | 4,646,880 | (83.4%) | 924,057 (16.6%) |

A comparison of the number of new Fund accounts opened in 1980 and 1981 processed through the Broker and through the Transfer Agent is as follows:

| New Accounts Opened Through: | Broker | | Transfer Agent | |
|---|---|---|---|---|
| 1980 | 541,682 | (99.05%) | 5,158 | (0.95%) |
| 1/81 - 6/81 | 503,962 | (97.49%) | 12,996 | (2.51%) |

14. A "Fund order" is a transaction with the Fund, and includes both purchases and redemptions of Fund shares as well as the incidents in the servicing of accounts.

15. Production credits, are based largely on, but are not congruent with commission revenue. Merrill Lynch's internal cost accounting system allocated costs according to production credits. Since MLPF&S did not charge the customer a sales load to process Fund orders, its activities with regard to the Fund did not generate any production credits and its costs were not allocated automatically by MLAM's accounting system. MLAM revenue was therefore used as

constituted 1.3% of all production credits, Diemer allocated 1.3% of MLPF&S branch expenses to the processing of Fund orders.

Diemer's estimate was met with firm opposition from Arthur Zeikel, the president of MLAM, who thought it overstated the Fund's burden on MLPF&S. Diemer had allocated a portion of *total* branch expenses to arrive at his estimate, but Zeikel thought an incremental cost approach would be more accurate, since most of MLPF&S branch costs would still remain even if the Fund were not in existence. On August 24, 1979, a memo was prepared by F. G. Fitz-Gerald, vice-president and chief financial officer of Merrill Lynch & Co., Inc., which showed the incremental costs of the Fund to MLPF&S for the first quarter of 1979 to be $2.02 per order.[16] On the basis of his figures, Fitz-Gerald recommended that MLAM reimburse MLPF&S for allocated processing costs according to the following schedule:

| | |
|---|---|
| First 500,000 orders | $3.00 per order |
| Second 500,000 orders | $2.00 per order |
| Balance | $1.50 per order |

The most recent estimate of MLPF&S's processing costs was made by the independent accounting firm of Peat, Marwick, Mitchell & Co. ("PMM") in anticipation of this litigation. The results of the study were reported to the Fund's Trustees on April 24, 1980 in connection with their annual consideration of the fee schedule of the Fund. Rather than constructing an entire new system of cost analysis of their own, PMM conducted an independent evaluation of how the costs should be allocated. PMM accountants visited a representative sample of Merrill Lynch branches all over the country and studied how much of their time was spent on Fund business.[17] PMM dealt most extensively with figures for the third quarter of 1979, and updated its findings quarterly until the first quarter of 1981. For the third quarter of 1979, PMM found that it cost MLPF&S $9.74 per order to process Fund orders. For the fourth quarter of 1979, its study showed that processing costs were $7.47 per order. Since then, in PMM's view, processing costs have remained in the range of $7.00 per order.[18]

The PMM study was by far the most comprehensive of the three, and the only one that involved any independent investigation of the costs at all. The partner in charge, Russell Peppet, presently vice-chairman of PMM and a cost accountant for over twenty years, testified that over 1,500 man-hours were spent on the study.

It would be an exceedingly difficult task for this Court to choose the proper method of accounting for determining the costs to MLPF&S of processing Fund orders. The problem with using full cost accounting in allocating MLPF&S branch expenses to the Fund is that branch personnel and facilities were largely in place before the Fund existed and will be needed to nearly the same extent if the Fund were discontinued. Yet, the extraordinary success of the Fund has meant that an incremental cost accounting approach is probably inappropriate as well. At the end of April, 1981, Fund orders constituted 37% of all business processed by MLPF&S. To handle the additional volume generated by the shareholders and customers of the Fund, Merrill Lynch had to hire approximately 3,000 non-sales personnel. By the time the Trustees met on May 7, 1981, these considerations had convinced

a substitute to allocate costs appropriately within the system.

**16.** For 1978, Fitz-Gerald found the incremental cost to be $2.16 per order. Fitz-Gerald also estimated the standard cost of processing a Fund order to be $3.30 for the same period.

**17.** Since PMM allocated a portion of *total* branch costs, it, like Diemer, used a full cost rather than an incremental cost approach.

**18.** PMM's figures are arguably conservative, since they do not allocate to the Fund any of the compensation of account executives, even though PMM found on the average that 10.25% of the typical account executive's time was devoted to Fund matters.

even Arthur Zeikel, who had originally pressed for such an approach, that the costs of processing Fund orders were too great to be analyzed on a strictly incremental basis.

The compensation accepted by the Adviser was not unfair whether viewed with or without consideration of the processing costs. The fees that are in dispute in this case derive from the schedule approved by the Trustees on April 24, 1980 and May 7, 1981. It cannot be gainsaid herein that the rate of fees are thoroughly in line with the market; the trial exhibits are conclusive on this score. In the month of April, 1980, the compensation actually paid to MLAM was approximately $2,479,565, which amounted to an annualized rate of $29,754,780. In April, 1981, just before the latest renewal of the fee schedule, the payments were running at a rate of $3,998,961 per month, or $47,987,532 per year.

On the other hand, it appears to the Court to be entirely proper for the fiduciary to consider the totality of the values placed at the disposal of the shareholders in appraising the fairness of the compensation, or else form would be substituted for substance. Considering its current size, the Fund could not be administered without the branch office and wire system provided by MLPF&S to handle the enormous volume of orders from shareholders for the purchase and redemption of shares and the informational services supplied. Moreover, it is self-evident that the larger the size of the Fund, the greater the investment advantages to the shareholders, advantages not available to smaller funds.

5. *The "distribution expense" argument*

Plaintiffs argue that these cost estimates for servicing the interests of the Fund and its shareholders do not measure expenses properly compensable by the Fund because they constitute "distribution" expenses under Section 12(b) of the Investment Company Act of 1940, which provides that:

It shall be unlawful for any registered open-end company (other than a company complying with the provisions of section 80a–10(d) of this title) to act as a distrib-

utor of securities of which it is the issuer, except through an underwriter, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. Sec. 80a–12(b) (1976).

■ However, plaintiffs have failed to prove that any of MLPF&S's processing costs are of the character of forbidden "distribution" expenses. The costs associated with the booking of orders and administrative costs associated with share orders and maintaining the accounts of investors in the Fund are managerial functions rather than promotional expenses.

Under Rule 12b–1, an investment company "will be deemed to be acting as a distributor of securities of which it is the issuer, other than through an underwriter, if it engages directly or indirectly in *financing any activity which is primarily intended to result in the sale of shares issued by such company.*" 17 C.F.R. Sec. 270.12b–1(2) (1981). The activity here of MLPF&S was not "primarily intended to result in the sale of shares."

In support of their argument seeking to ascribe distribution to the processing function, plaintiffs point to the fact that Merrill Lynch's internal documents referred to the branch expenses portion of MLPF&S processing costs as "branch office selling expenses." By attempting to equate Merrill Lynch's use of the word "selling" with forbidden "distribution" under the SEC rule, plaintiffs had hoped-but failed-to show that some portion of the processing costs were in reality distribution costs which cannot be considered in assessing the reasonableness of the advisory fee.

Plaintiffs have failed to demonstrate that the branch office selling expenses were in fact related to activity intended to result in the sale of Fund shares. Branch expenses were allocated in order to derive a figure for how much it cost MLPF&S to process Fund orders; the allocated expenses did not pretend to describe what activities branch personnel actually performed in processing Fund orders. Even PMM, which did the

most detailed survey of branch activity, only calculated how much time branch personnel devoted to Fund processing and not whether they devoted that time to selling or not.

What evidence there is goes against plaintiffs' contention that a significant portion of MLPF&S' processing costs are distribution expenses. Much of MLPF&S' processing costs have to do with the redemption of Fund shares and the administrative functions involved in servicing existing shareholder accounts. Such costs do not relate to the *sale* of Fund shares at all. It is apparent, moreover, that all throughout the period under consideration the compelling impetus has been to seek high interest returns on money deposits. In essence, therefore, Fund shares have been bought, not sold; there was no basis in the evidence of activity primarily intended to result in the sale of Fund shares.

If there is indeed any relevance to costs as contrasted with the price of services as established in the market, then processing costs are properly to be taken account of in measuring performance of fiduciary obligation. Moreover, this Court does not have to choose the most accurate cost accounting method to measure the processing costs attributable to the requirements of investors and the Fund, for whichever estimate of cost to MLPF&S of processing Fund orders is used, the net compensation to the Merrill

Lynch organization as a whole does not appear unfair.[19] Indeed, as the following chart shows, utilizing the Diemer and the PMM cost estimates in the calculation of MLAM's after-tax income suggests that the Fund may currently even be a net losing proposition to the Merrill Lynch organization.[20] Even using Fitz-Gerald's lower estimate for processing costs, it appears that the Merrill Lynch organization received less than $6.2 million in after-tax income in compensation for servicing the billions of dollars managed for the Fund and its shareholders in the twelve month period ending June 30, 1981 and a little over $5 million in the calendar year 1980.

■ It is obviously appropriate to view the net results to the fiduciary of the compensation he receives, after taxes, in considering the question of the fairness with which a fiduciary serves a fund. *See Black v. Parker Mfg. Co.*, 329 Mass. 105, 117, 106 N.E.2d 544, 552 (1952) ("The effect of taxes on the income of the individual, as well as on the income of the corporation, is properly to be considered in determining the reasonableness of the salaries paid."). To the same effect, see *Heller v. Boylan*, 29 N.Y. S.2d 653, 674 (N.Y.Sup.Ct. 1941), *aff'd*, 263 App.Div. 815, 32 N.Y.S.2d 131 (1st Dep't 1941) ("A consideration of these enormous payments cannot ignore the high toll of the tax collector").

### ML ASSET MANAGEMENT, INC.

| ML Ready Assets Trust | Calendar Year 1980 | 6/30/80 – 6/30/81 |
|---|---|---|
| Average Net Assets | $11.16 billion | $13.52 billion |
| Average No. of Shareholders | 675,324 | 835,618 |
| Management Fee—MLAM | $33,008,025 | $39,369,587 |
| MLAM Direct Expenses | | |
| Office & Salary | $ 1,567,847 | $ 1,567,847* |
| Income Tax (55.774%) | $17,535,445 | $21,083,543 |
| Net Earnings | $13,904,733 | $16,718,197 |
| Order Volume Through MLPF&S | 4,949,200 | 6,096,537 |

19. Even plaintiffs' witness, an economist, said that if he were to assume that processing costs are properly taken into account in determining the compensation paid to the fiduciary he would not be able to formulate an opinion as to the reasonableness of the Investment Advisor's compensation.

20. Others have recognized that money market funds might in fact lose money for their sponsors. *See* 601 Sec. Reg. & L. Rep. (BNA) A–4, 5 (Apr. 29, 1981) (remarks of Adrian L. Banky, senior vice-president of the Securities Industries Ass'n.).

## ML MANAGEMENT, INC.

| Processing Costs | Calendar Year 1980 | 6/30/80 – 6/30/81 |
|---|---|---|
| Reimbursement to MLPF&S | $ 8,563,000** | N/A |
| ML (Fitz–Gerald) – estimated | $ 8,813,800 | $10,534,805 |
| ML (Diemer) – estimated | $25,042,952 | $30,848,477 |
| PMM & Co. – estimated | $36,970,524 | $45,541,131 |
| | | |
| Profitability of Services Supplied | | |
| After reimbursement to MLPF&S | $ 5,341,733 | N/A |
| After ML (Fitz–Gerald) estimate | $ 5,090,933 | $ 6,183,392 |
| After ML (Diemer) estimate | ($11,138,219)*** | ($14,130,280)*** |
| After PMM & Co. estimate | ($23,065,791)*** | ($28,822,934)*** |

*The figure for office and salary expenses in calendar year 1980 was used as an estimate for such expenses for the period 6/30/80 – 6/30/81.

** Reimbursement was based on the Fitz-Gerald schedule, but differs slightly from it because different (evidently tentative) figures for order volume were used.

*** Subject to adjustment of the income tax liability shown above.

Even adopting the lowest estimate of the processing costs (the reimbursement figure of the Fitz-Gerald estimate), the profitability of administering the Fund and the shareholder services amounted to four and a half ten thousandths (0.00045) of the average net assets under supervision.

Plaintiffs also argue that the processing services of MLPF&S involved in the foregoing estimates of cost overlap aspects of MLPF&S's obligations under its Distribution Agreement with the Fund. The attempt to illustrate this on cross-examination failed and the exhibits do not support that claim beyond the possibility of some minor portion of the services rendered by MLPF&S. The bulk of the processing services are not the same services that MLFD is bound by contract to perform; the processing costs, while difficult to ascertain with any precision, are clearly of great magnitude for which no adequate substitute is readily available.

### B. *Economics of Scale*

As one factor in assessing the fairness of the advisory agreement, Congress intended that the courts determine whether the investment advisor has taken account of any economies of scale in the management of the fund in setting the advisory fee. "[T]his bill recognizes that investors should share equitably, as they do in other areas, in the economies available as a result of the growth and general acceptance of mutual funds." *Senate Report* at 4 U.S.Code Cong. & Admin. News 1970, p. 4901. As Senator Percy stated:

Adequate compensation and incentives must be provided to companies and individuals which advise the fund on its investments and market fund shares; however, individual investors must share equitably in the economies of scale available as a result of tremendous growth in this industry. 115 Cong. Rec. 13699–700 (1969).

Congress implicitly recognized that it might be impossible in some instances to conform to the "desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide." *Senate Report*, at 6 U.S. Code Cong. & Admin. News 1970, p. 4902.

Clearly, the present schedule takes account of economies of scale; the rate of fees diminishes progressively. *See Krasner v. Dreyfus Corp.*, 90 F.R.D. 665, 669 (S.D.N.Y.1981).

Defendants have raised doubts as to whether there are further economies of

scale in the provision of the services. While the unit costs of portfolio management and general administrative services have almost certainly declined as the Fund has grown, the far greater costs of providing shareholder services appear to have remained relatively stable.

As the trustees were informed in 1980, this was MLAM's reason for refusing to introduce any additional breakpoints.

MLAM does not propose to introduce additional breakpoints at assets levels over $2.5 billion because it believes the economies of scale applicable at lower asset levels tend to diminish when the fee rate reaches 0.275%..... [T]his "diminishing return" occurs largely because the costs of MLAM and Merrill Lynch associated with processing orders and administering shareholder accounts have not diminished as assets increase beyond the $2.5 billion level.

Of the three studies of processing costs available to the Court, the only one which was performed over a significant number of quarterly periods was the PMM study. That study found that unit processing costs did not significantly diminish as the Fund grew larger. In the fourth quarter of 1979, for example, costs per order amounted to $7.63, while by the first quarter of 1981 they were only 35 ¢ less. Of course, if the number of shareholder orders increased at a slower rate than the asset level, Merrill Lynch would still be making more money even though the cost of processing a single order remained the same. However, it appears that the ratio of order volume to assets did not diminish as the Fund grew larger. From June 1980 to June 1981 the ratio of order volume to Fund assets actually increased, from .0000287 to .0000392.

That processing costs do not significantly diminish as Fund assets increase accords with logic and common sense. While it may be almost as easy to invest a block of $100 million as a block of $10 million, it requires substantially more time, money and personnel to process 1 million shareholder orders than 100,000 orders. The ease and speed with which Fund shares can be bought or redeemed is crucial to the success of any money market fund, especially since the investor loses money for every minute his funds lie unemployed. Merrill Lynch added more than 3,000 non-sales personnel to handle the additional transaction volume caused by the Fund.

In any event, even if there do exist economies of scale, the present structure of MLAM's fee means that its effective fee has decreased as the size of the Fund has grown.

■ In view of the above considerations, the total compensation paid for the services supplied adequately passes a "rigorous scrutiny for fairness". *See Galfand v. Chestnutt*, 545 F.2d 807, 811–12 (2d Cir. 1976). The ultimate decision of the Trustees was objectively reasonable, as the total fee was fair to the Fund.

### C. *The Benefits to Merrill Lynch As a Whole Because of the Fund*

■ Plaintiffs also contend that MLAM distorted the burden shouldered by MLPF&S by describing only the costs associated with Fund transactions without offsetting therefrom the value of associated fall-out business allegedly realized by MLPF&S.

Plaintiffs argue that the Fund is an important sales tool for the Merrill Lynch organization as a whole, for it allows Merrill Lynch to attract new accounts and retain existing ones. They argue that having opened up an account with Merrill Lynch in order to gain access to the Fund, customers will find it convenient to transact other sorts of financial business with Merrill Lynch. Moreover, using the Fund, Merrill Lynch presumably can retain control over its customers' money, since account executives can urge that customers deposit their money in the Fund between commission-generating securities trades. Lastly, plaintiffs say that Fund customers are more likely to choose Merrill Lynch as their broker in the event of an upturn in the stock market.

The principal difficulty with plaintiffs' contentions lies in measuring the value of these beneficial aspects of the relationship. Plaintiffs' witness, Donald Peskin, an employee of the accounting firm of Laventhol & Horwath, testified that it would be possible to measure how much business came into Merrill Lynch from customers who were originally attracted by the Fund. For example, the study performed by PMM showed that 38% of those customers who opened an account with Merrill Lynch by buying shares of the Fund in the third quarter of 1979 did some non-Fund business by January 1980. Peskin thought it would be possible, as a statistical matter, to estimate how much non-Fund revenue such customers generated. However, as he conceded, some new customers who opened a Fund account and then did other business with Merrill Lynch might have done so even had the Fund not existed. Defendants' expert, Russell Peppet, thought this problem of circularity would make any calculation of fall-out benefits "extremely difficult."

Similarly, even assuming that customers with Fund accounts did more than the average amount of brokerage business,[21] it would be difficult to demonstrate whether the increase in brokerage activity was a result of the Fund's existence, or whether customers who normally did an above-average level of brokerage business also tended to have Fund accounts.

The difficulty in proving cause and effect is also present in measuring the value of having a large pool of customers' assets close at hand in the event of development of an interest to invest in the stock market. While Peskin suggested that it would be possible to estimate the increase in brokerage business corresponding to a drop in the Fund's asset level, he did not state how he could tell what portion of the funds would not have gone to Merrill Lynch in any event. After all, any developing interest in the stock market is bound to result in an increase in Merrill Lynch's brokerage business from Fund customers. Even if it could be proved that persons with Fund accounts increased their brokerage business by a greater than average amount when the stock market improved, this would not demonstrate that the Fund's existence was the cause. As with the issue of non-Fund brokerage business in general, the possibility exists that those customers that react most strongly to an incentive to participate in the securities market are also those most likely to have an account with the Fund at the present time, and not vice-versa.[22]

The testimony of both Peskin and Peppet demonstrates that any study of the benefits to Merrill Lynch as a result of the Fund's existence would be difficult, time-consuming and expensive, and probably entirely inconclusive, even if all of the logical problems could be resolved. Indeed, plaintiffs concede that they could not afford to hire Laventhol to perform any of the studies that they speculated were possible. Thus, the Court cannot be assured that all, or indeed any, of the studies' suggested (but not performed) by the plaintiffs were in fact practical or would be illuminating.

As the Audit Committee minutes for its annual meetings in 1980 and 1981 show, the independent trustees were aware that there were "potential benefits to Merrill Lynch of the interface with the Trust . . . including new account opportunities and continued influence over the investment of Merrill Lynch customer assets." It is true that they were not provided with dollar estimates of those benefits, but plaintiffs have not demonstrated that meaningful estimates could be provided even with extreme difficulty and expense. In these circumstances, MLAM discharged its fiduciary duty by making sure (which it did) that the Trustees were informed of the types of conceivable benefits the Fund's existence might confer on the Merrill Lynch organization.

---

**21.** Other than speculation by the plaintiffs, there is no basis for such an assumption in the record.

**22.** Since no one pretends to know when activity in the market will occur, it would be difficult to measure the present value of a future increase in brokerage business.

Taken from another view, the hypothesized but not proved fall-out benefits proclaimed by the plaintiffs to have been obtained by Merrill Lynch through the servicing of Fund shareholder requirements furnish no offset to the cost of compensability of that processing. There is no logical reason why a mutual fund shareholder should not pay for processing the Fund orders executed for him because he also pays a commission to the brokerage firm on the purchase of stocks and bonds; one does not offset the other.

Plaintiffs also argued that Merrill Lynch derives income from the "float" on checks to redeeming customers from reciprocal business from those institutions in which the Fund invests, and from transactions with the Fund as principal through Merrill Lynch Government Securities, Inc.

The overwhelming majority of customers redeem Fund shares through the broker rather than the Transfer Agent, the Bank of New York. When a redemption occurs, money is transferred from the Fund to MLPF&S. From the time the checks are issued by the MLPF&S until the time they are finally presented to the bank for payment, MLPF&S has the use of the funds which it can invest as it wishes. Plaintiffs complain that the Trustees were never told of this benefit to Merrill Lynch. However, the Trustees were aware of the way in which orders were processed through MLPF&S,[23] and consequently, it was obvious that there was a possibility of a float. Thus there was no breach by MLAM of its fiduciary duty in failing to actually calculate the value of having the use of the money while checks to Fund customers were still outstanding.

The absurdity of the claim that the Bank of New York was in a position to perform the services MLPF&S provided to the Fund shareholders needs little attention. Suffice it to say that there was no proof adduced by plaintiffs that there was unnecessary duplication or unnecessary facilitation of the shareholders and the Fund by MLPF&S.

The issue here is not whether the servicing requirements are to be labeled a "conduit" service or a "funneling service" or otherwise, but whether objectively, those services and their estimated costs may be considered in evaluating the fairness of the amounts paid as contingent compensation by the Fund. The factual answer on this record is clearly in the affirmative.

The possibility that institutions in which the Fund invests might reciprocate by placing brokerage business with Merrill Lynch is mere speculation on the part of plaintiffs. There has been no showing that such reciprocal arrangements exist, or that their value can be estimated.

Finally, the fact that Merrill Lynch Government Securities, Inc. receives a dealer spread on transactions with the Fund has been disclosed in every proxy statement for the past three years, as well as in booklets given annually to the Trustees for at least the past four years.

In short, only conclusory assumptions, not evidence, supports the theses of offsetting benefits adduced by plaintiffs. The testimony of the independent Trustees adequately indicates their appreciation and understanding of the picture, as well as the fact that they were not expected to evaluate the compensation paid on a cost-plus basis by taking into account the nebulous offsets pressed by the plaintiffs. The citation by plaintiffs of cases of abuse of a Fund's assets have no relevancy here. Contrast *Steadman v. S.E.C.*, 603 F.2d 1126 (5th Cir. 1979), *aff'd*, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981).

*The Approval of the Advisory Agreement by the Trustees*

■ Section 36(b) instructs the courts to give director and shareholder approval of advisory compensation arrangements "such consideration ... as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a–35(b)(2) (1976). In weighing the approval by the Trustees, this Court must keep in mind that "the structure and pur-

---

23. For example, on May 8, 1979, the Trustees received an overview of the way in which pur-

chases and redemptions were processed through MLPF&S.

pose of the [Act] indicate that Congress entrusted to the independent directors of investment companies ... the primary responsibility for looking after the interests of the funds' shareholders." *Burks v. Lasker*, 441 U.S. 471, 484–85, 99 S.Ct. 1831, 1840–41, 60 L.Ed.2d 404 (1979).

The facts in this case demonstrate that the approval of the advisory fee by the board of trustees of the Fund should be weighted heavily, since the Trustees gave careful consideration and were adequately informed at all times of the structure and price being paid by the Fund, the going price in the market of comparable services, the scope of the services rendered, the performance achieved, the nature of the costs of the services supplied, their estimated value and the profitability of the contract overall. The Trustees knew and considered the alternatives available and the hypothetical value of the contract to the Merrill Lynch organization as a whole.

### A. The Identity and Experience of the Non-Interested Trustees

The board of trustees of the Fund consisted of eight Trustees, six of whom are non-interested within the meaning of the Investment Company Act. The non-interested Trustees are men of maturity and substantial statute with singular qualifications and experience in diverse fields, having held positions of importance in the world of business, finance, investment and education. All have had responsibilities and experience in some form of securities portfolio management. Their independence and their competence as trustees were not questioned or questionable herein and they have been free of domination or undue influence by MLAM and its affiliates.

### B. The Attention of the Trustees was Fixed on Their Responsibilities

In the Senate Report, at page 7, U.S. Code Cong. & Admin. News 1970, p. 4903, the following is noted:

The bill also contains provisions which are designed to assist directors in discharging their responsibilities. Included is a proposal that the directors must request and evaluate, and that the investment adviser must furnish to them, such information as is reasonably necessary to evaluate the terms of the management contract. Thus, the attention of the directors will be fixed on their responsibilities.

Accordingly, the MLAM directors were told in the memorandum to independent Trustees dated April 15, 1981 (like information was furnished in earlier years) that in reviewing and approving the agreement with MLAM and MLFD:

As the independent Trustees you bear the principal responsibility for evaluating the advisory and distribution agreements, determining their reasonableness and considering the available alternatives from the standpoint of the best interests of the Trust and its shareholders.

\* \* \* \* \* \*

In making the necessary determinations and findings it is essential that you have adequate information upon which to make reasonable judgments.

Having thus been alerted, the independent Trustees were told that the courts have interpreted Section 15(c) of the Act to require a substantial degree of inquiry, knowledge and critical judgment on the part of fund directors; that Section 36(b) provides that investment advisers have a fiduciary duty with respect to the receipt of compensation for services and provides an express cause of action for recovery of excessive management compensation.

It was emphasized to the Trustees that "*[i]n making their determination in this area, the independent trustees must be fully informed in an impartial manner of all relevant factors with respect to the advisory agreements and, after a thorough review of all relevant factors, must reach agreement with the Fund's investment adviser on the basis of arm's length bargaining.*" (Emphasis in original). They were told that the major consideration would be their analysis of the reasonableness of the proposed advisory fee under prevailing facts and circumstances. To underscore this mention was

made of the fact that two suits were already pending affecting the Fund. These were reviewed and their contentions exposed; namely, that the charges against MLAM included breach of fiduciary duty by receiving advisory fees which were excessive and disproportionate to the services rendered and that the proxy statements to the shareholders misrepresented the benefits of economies of scale and failed adequately to disclose the costs of the investment adviser.

Attention was called to the fact that the advisory agreement in its present form was to be continued for an additional year, being the identical agreement theretofore approved by the Trustees as well as by the shareholders in 1979 and 1980.

Attention was drawn to the fundamental alternatives to the MLAM proposal to be kept in mind, such as internal management or seeking a different investment adviser; the scope of the services provided by MLAM and its affiliates; and an analysis of the proposed advisory fee.

## C. *The Trustees' Deliberations*

The record establishes that the Trustees were supplied with information sufficient to enable them to evaluate the advisory contract with an eye willing and capable of discerning the interests of the Fund, including the bargaining power generated by the Fund's enormous size. *See Fogel v. Chestnutt*, 533 F.2d 731, 749 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). The Adviser fully complied with the duty of full disclosure required of it by Section 36(b). *See Galfand v. Chestnutt*, 545 F.2d 807, 811 (2d Cir. 1976); *Fogel, supra*, 533 F.2d at 745; *Moses v. Burgin*, 445 F.2d 369, 377–78 (1st Cir.), *cert. denied*, 404 U.S. 994, 92 S.Ct. 532, 30 L.Ed.2d 547 (1971); *Papilsky v. Berndt*, [1976–1977] Fed.Sec.L.Rep. (CCH) ¶ 95,627, at p. 90,132 (S.D.N.Y.1976). *Cf. Tannenbaum v. Zeller*, 552 F.2d 402, 417 (2d Cir.), *cert. denied*, 431 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977) (§ 36(a)).

As indicated previously, attention herein must be focused ultimately upon the Trustees' meetings of April 24, 1980 and May 7, 1981, at which the Trustees renewed the fee schedule according to which the disputed payments were made. It will be useful, however, to refer to earlier meetings in order to place the Trustee's consideration of the fees in its proper context.

Since January 1977, the non-interested Trustees of the Fund have been represented by independent counsel. The independent Trustees by themselves constitute the Audit Committee of the Fund. Typically, before the annual meeting of the board of trustees, the independent Trustees meet as the Audit Committee to consider the appropriateness of the advisory agreement.

An impressive amount of documentary material was furnished to the Trustees so that they could carry out their responsibilities in considering the fairness of the advisory agreement. A summary of the material shows its comprehensive scope.

First, throughout the period with which this suit is concerned, the Trustees received weekly reports regarding the operation of the Fund. These reports contain a summary of the number of new shares issued, the number of shares redeemed during the week, as well as the change in the Fund's asset value during the period. The report also states the annualized dividend return along with the current portfolio yield.

Second, before each quarterly meeting the Trustees received "agenda booklets". These reports include a summary of developments in the economy, a description of the Fund's portfolio transactions, a summary of performance data for similar funds, and descriptions of the yield and structure of the Fund's portfolio. In the agenda booklets, the Trustees were provided with the materials to gain a clear portrait of the phenomenal growth of the Fund: figures were displayed by month for the number of shareholders, the Fund's net assets and the volume of Fund orders processed through MLPF&S. The quarterly report for January 30, 1980 given at the meeting held on that date summarized the 1979 reimbursement by MLAM to MLPF&S for processing orders of the investors in the Fund.

Third, several weeks before every annual meeting each Trustee was provided with a "Trustee booklet". The booklet for the meeting of April 24, 1980 is over 200 pages long. It contains a comprehensive memorandum from counsel for the Fund discussing, among other things, the statutory role of the Trustees and the issues to be discussed at the annual meeting, and includes a statement of alternatives to the MLAM advisory fee proposal. The Trustee booklet for the 1980 meeting also includes the number of shareholder accounts being serviced, the number of orders being processed for investors, profitability statements of MLAM, copies of the investment advisory and distribution agreements as well as data comparing the Fund's advisory fee, performance and operating expenses and expense ratios with those of other funds, and a description of the Fund's portfolio transactions, including those as principal with Merrill Lynch Government Securities, Inc. Lastly, the 1980 booklet sets forth data regarding Merrill Lynch's costs in processing Fund orders, as well as information regarding SEC proposals for regulating the use of Fund assets for distribution.

The Trustee booklet for the meeting of May 7, 1981 was over 250 pages long. As well as containing the types of information as in the Trustee booklet for the previous year, the 1981 booklet included an opinion of Fund counsel as to the propriety of taking account of MLPF&S's processing costs in considering the fairness of the advisory fee, along with the recent SEC Rule 12b–1 and accompanying Release No. 11414 governing distribution costs, and a memorandum by Fund counsel discussing the decision-making process in the investment company area.

The question of the costs to the Merrill Lynch organization as a whole from the operation of the Fund had "surfaced . . . in 1977, . . . but it became a matter of continuing and more intense concern after April 1978." (Tr. at 254).

The question of costs sparked an internal accounting debate within the Merrill Lynch organization as to how to measure the costs to Merrill Lynch associated with the operation of the Fund. The evidence shows that the Trustees were kept fully informed of Merrill Lynch's progress in coming up with solid figures concerning the costs associated with Fund transactions.

As early as the meeting of May 8, 1979, the Trustees were informed of the existence and results of the Diemer study of processing costs. In his presentation to the Audit Committee on that day, Arthur Zeikel, president of MLAM, reported that a preliminary study indicated that the costs to MLPF&S associated with Fund transactions were about $5 per order. Zeikel stated that "he could not evaluate the accuracy of the study, that many assumptions were included therein and that he expected the figures to be further refined." [24] He further noted that "each subsidiary of Merrill Lynch & Co. operates as a separate profit center and that MLAM was under considerable pressure to compensate MLPF&S for its costs."

The independent Trustees were then given a memorandum prepared by counsel for the Fund which advised them that they could consider the expenses of MLPF&S in determining the fairness of the advisory fee if they determined: 1) that MLPF&S's services benefited the Fund, 2) that those services are responsible for the Fund's present success, and 3) that there is no adequate substitute for the services. However, counsel to the independent Trustees pointed to a question that had been raised, "that processing costs could be considered to be distribution expenses". After reviewing the position of the Securities and Exchange Commission on this matter, he concluded that "it was far from certain as to whether distribution expenses could be considered in fixing an advisory fee."

The legal advice concerning the processing costs was conservative and neutral and sufficiently indicated the legal uncertainties

**24.** All quotations in this section, unless otherwise identified, are from the minutes of the meetings.

involved. It was sound adequate advice which permitted an independent consideration and evaluation of the fee agreement by the Trustees and its relation to the total compensation payable by the Fund for services.

The independent Trustees asked how much the services of MLPF&S benefited the Fund and to what extent the services could be purchased elsewhere. MLAM's corporate counsel replied that while there would only be a "modest" increase in the fees of the Transfer Agent if MLPF&S were not employed, the Transfer Agent would not provide the access for shareholders that was desirable and provided by MLPF&S. And Zeikel noted that "[e]xpenses to facilitate shareholder orders, in one form or another, are essential for the successful operation of money market funds."

The summary of the discussion at the May 8, 1979 Audit Committee meeting shows that it was becoming clear to Merrill Lynch that Fund transactions were resulting in substantial, mounting expenses to MLPF&S. Nonetheless, MLAM at the time voluntarily proposed an additional breakpoint in the fee schedule of a rate of 0.275% of average assets over $2.5 billion. This was in line with discussion at the meeting that "recognized that MLAM's profits from advising the [Fund] subsidize MLAM's other operations."

Zeikel stated "that MLAM would continually monitor its operations during the year and discuss possible further breakpoints during the year if deemed feasible."

The independent Trustees, as the Audit Committee, then considered the fee paid to the Adviser. They noted that:

1. There could be no direct comparison with other money market funds since the Fund was so large.

2. Much of the success of the Fund was due to the efforts of MLAM and MLPF&S and "they certainly were entitled to an ample profit for their endeavors."

3. From the point of view of its expense ratio and the impact of the fee on the shareholder, the fee was not excessive.

"The [independent] Trustees agreed that, while they were uneasy about the profits to MLAM, they would approve the proposed fee subject to periodic review during the year." The fee was consequently approved by a unanimous vote of the Trustees at the full board meeting which followed that of the Audit Committee.

Internal documents in June 1979, record Zeikel's disputed opinion that the $5 per order estimate prepared by Diemer had overstated the burden on MLPF&S of the Fund's processing costs. Shareholder orders were running at this time at the annual rate of 2,143,176.

At the July 25, 1979 meeting of the board of trustees, they received information of the filing of Gartenberg's suit, which had been commenced on June 14, and were told of that shareholder's contentions.

Zeikel evidently waited to present to the Trustees the dispute between himself and MLPF&S over the amount of the processing burden created by the Fund until he had some figures to support his opinion. The Fitz-Gerald estimate, which found the Fund's burden on MLPF&S to be significantly lower than the $5 per order estimate urged by Diemer, was ready in late August. At the following Trustees' meeting, on October 24, 1979, Zeikel told the Trustees that the cost studies he had received placed the processing cost to MLPF&S at either $5 or $2 per order. He noted that the results of the studies were not final. Shareholder orders were meanwhile zooming upward and were running in a monthly quantity annualized at 4,013,688.

At the same meeting, Mr. Ross, one of the interested Trustees, stated that he had been given the authority to allocate costs between MLAM and MLPF&S. He thought that insofar as total costs to the organization were concerned, the $5 per order figure would be firm. He also argued "that the fee schedule should be based on the total cost to the Merrill Lynch complex for providing the services and not the internal allocation of costs between MLAM and MLPF&S."

Zeikel noted that if the $5 per order figure was correct, "then the profitability to MLAM and MLPF&S would be thin at the present fee levels;" consequently, continued fee reductions at regular intervals would reach the point where MLAM would lose money.

On November 1, 1979, Zeikel sent copies to the Trustees of the memos that had come up with the $5 and $2 per order figures. He also informed the Trustees that a complaint had been filed in the *Andre* case on October 23, 1979.

The intracompany charge between MLPF&S and MLAM as estimated by the staff was expressly discussed at the Trustees' meeting held on January 30, 1980. The final arrangements for the 1979 reimbursement of MLPF&S to MLAM totalled $5,059,712, using Fitz-Gerald's cost estimate of $3 each for the first 500,000 transactions, $2 each for the next 500,000 and $1.50 for the remaining 1,446,475 added to direct costs to MLPF&S of $390,000.

The sharp upward spike of orders being processed in 1980 and 1981 was reported to the Trustees in monthly figures given in the quarterly reports. The range of the internal and external studies of the processing costs on a per order basis were discussed with the Trustees. The arithmetical results of the costs multiplied by the order volume were obvious.

At the Trustees' meeting on January 30, 1980, PMM reported on their preliminary study of Fund processing costs, specifically, those Merrill Lynch costs in the third quarter of 1979 that were attributable to services provided for shareholders of the Fund.[25] Their report placed the approximate cost of processing orders during this particular quarter at $9.74 apiece. In light of the PMM report, MLAM decided not to adjust the advisory fee and the Trustees agreed.

The Audit Committee minutes for the meeting of April 24, 1980 contain an extensive description of the discussion at that time concerning the advisory fee agreement, servicing and processing costs, Fund performance, expense ratio, revenues and profits to MLAM.

The Committee considered:

1. the service, operation and personnel of MLAM in relation to the Fund's activities and requirements, including servicing and processing provided by MLPF&S.

2. the Fund's portfolio performance in general and in relation to other money market funds, noting the complexities of managing and investing such a large amount of money.

3. the Fund's fee structure and expense ratio compared to the rest of the industry.

4. the sizable revenues and profits to MLAM.

The counsel for the independent Trustees discussed their responsibilities with them. He thought it would be preferable at the time to reach a decision about the advisory fee "without significant regard to" the costs of shareholder services and processing provided by Merrill Lynch until the PMM study was completed. "[H]e recommended, therefore, that little or no weight be given to the preliminary cost data which had so far been furnished to the non-interested Trustees."

The option of an additional breakpoint in the fee schedule was raised and rejected.

According to the Audit Committee minutes:

The Committee also discussed the potential benefits to Merrill Lynch of the interface with the [Fund] which gave rise to the principal shareholder servicing and processing activities of Merrill Lynch, including new account opportunities and continued influence over the investment of Merrill Lynch customer assets.

The Committee also considered and rejected the option of switching investment advisers or internalizing the management of the portfolio.

At the full meeting of the board of trustees, the continuation of the present fee

---

**25.** PMM had been retained in connection with the *Gartenberg* suit.

schedule was approved after the Trustees heard PMM's second presentation regarding the Fund's processing costs. That presentation indicated a cost estimate in the $7 per order range for the first quarter of 1980. Mr. Cecil, a non-interested Trustee, mentioned that "MLAM had done an exceptional job in terms of performance for the shareholders of the [Fund]."

The last meeting that the record describes is the most recent annual meeting held on May 7, 1981. Again, the Trustees' deliberations are portrayed in a detailed manner.

Mr. Zeikel described the burdens that the "runaway phenomenon" of recent Fund growth had put on the Merrill Lynch organization. The Fund had grown to 1,100,000 shareholders, "almost all" of whom had acquired their shares through MLPF&S, and the net assets of the Fund under supervision and servicing were $17 billion.

Approximately 30% of these shareholders "do no business with Merrill Lynch other than purchasing and redeeming [Fund] shares and . . . the transaction and information demands of the [Fund's] shareholders imposed enormous physical and financial burdens on Merrill Lynch's systems and operations and on Merrill Lynch's account executives."

"[T]his high level of activity was customer driven and . . . no organized promotion of the sale of [Fund] shares or share distribution effort on the part of Merrill Lynch or the Distributor was taking place."

Zeikel noted that Fund transactions constituted 37% of all transactions processed by Merrill Lynch. This made the costs of processing Fund shares too great to be analyzed on an incremental basis, but quantifying them exactly was impossible. However, not only did Merrill Lynch's and PMM's studies show that the costs involved were large, but significantly, so did the fact that Merrill Lynch had added approximately 3,000 non-sales personnel to handle the additional transaction volume.

While Mr. Armstrong—an independent Trustee—raised the possibility of instituting another breakpoint in the fee schedule, most of the independent Trustees seemed to find little basis on which to do that. Mr. Cecil and Mr. Meyer remarked on the low number of customer complaints with the Fund, despite reports that account executives were dissatisfied with it since the work they did for the Fund generated no commission revenue for them. Mr. Cecil also remarked on the excellent yield of the Fund. Finally, Mr. James pointed out that

it was clear that substantial processing and servicing costs were being incurred by Merrill Lynch on account of the [Fund], even though it appeared impossible to ascertain their magnitude.

[H]e said that these costs had to burden profitability from the Investment Advisory Agreement, and he thought it would be a mistake to push too far on the profitability issue in view of the excellent job MLAM was doing in handling the [Fund's] extraordinarily large assets and number of shareholders.

The lawyer for the independent Trustees then recommended that the Trustees could properly take Merrill Lynch's processing costs into account in considering the reasonableness of the fee. This advice, which constituted a modification of his previous opinion on the matter, was a result of SEC Release No. 11414, promulgated in late 1980, which had for the first time clarified and established the definition of prohibited distribution as "activity which is primarily intended to result in the sale of [investment company] shares."

The Audit Committee then considered the fee in light of:

1. the services provided by Merrill Lynch and MLAM.
2. the Fund's portfolio performance in general and in comparison to other funds.
3. the Fund's fee structure and expense ratio in general and in relation to other funds.
4. the sizable revenues and profits to MLAM.
5. the possible benefits to Merrill Lynch.

The Audit Committee also considered and rejected the possibility of switching or internalizing the management of the Fund.

At the full board meeting the advisory agreement was discussed and approved for another year without any changes in the fee schedule.

*Summary*

The Court's evaluation of the testimony of the Trustees who took the stand and a close examination of the records of the Trustees' meetings demonstrates that their attention was properly focused on their obligations regarding the compensation to be paid to MLAM. They were made aware of the scope of the net assets under supervision and how they were being administered. They were made aware of the performance of the Adviser under its agreement and of the ratio of expense to the size of the Fund. They were furnished with comparable data concerning other money market funds and they were given prompt and complete information relevant to the services being supplied by the Merrill Lynch system including the Fund's processing burden on MLPF&S. They had the information to appraise the revenues and net profitability of servicing the assets.

The non-interested Trustees were represented by their own independent counsel at the meetings, who acted to give them conscientious and competent advice. The discussion concerning the advisory agreement and the processing costs appear to have been frank and open, and belie any contention that the Trustees were dominated by the Adviser. The Trustees exercised an informed judgment in good faith and upon a reasonable basis.

It is appropriate, therefore, to weight heavily the approval of the investment advisory agreement by the Trustees on April 24, 1980 and again on May 7, 1981 in determining the fairness to the Fund of the compensation which it paid.

In the summer of 1981, the independent Trustees had the opportunity again to consider and expressly approved the schedule of compensation to MLAM. On that occasion every argument and its minutiae made now by the plaintiffs was fully before the Trustees. The occasion was the plaintiffs' demand on July 14, 1981 (for the first time) that the Trustees commence this suit.[26] No claim could thereafter be made that the Trustees lacked this or that piece of information as now thrust into this record or were misled in their consideration of the compensation. All of the plaintiffs' selective, analyses and convenient inferences were made to and turned aside by the Trustees. This was not *"post litem motam"* consideration. It was an evaluation made after depositions had been taken on a specific complaint and proposed findings of fact which were prepared and ventilated by plaintiffs in these lawsuits. This was not merely, as Andre would have it, a post hoc reconstruction of mental processes to remedy defective disclosures.

*The Shareholders' Consideration of the Fee*

■ The shareholders of the Fund have approved every advisory fee agreement that has been entered into between MLAM and the Fund. In this case, shareholder approval may be given some, but not substantial weight, in determining whether or not MLAM has complied with its fiduciary duties.

As is apparent from the portion set forth in the margin, the proxy statements for the shareholders' meetings of August 7, 1980 and August 6, 1981 stated clearly that the present suits had been filed and that they challenged the fairness of the advisory agreement and mentioned the grounds asserted.[27]

---

26. At the hearing of September 4, 1981, counsel for plaintiff Gartenberg confessed that he had started the suit in error without a demand; he had not realized that the suit required such a demand.

27. The proxy materials stated:
MLAM has been named as a defendant in two derivative actions, commenced by two individual shareholders in June and October,

1979, respectively, on behalf of the [Fund] in the United States District Court for the Southern District of New York. Both complaints charge that the Investment Adviser has breached its fiduciary duty to the [Fund] by charging advisory fees which are excessive and disproportionate to the services rendered by MLAM. One of the complaints

The same proxy materials clearly detailed MLAM's advisory fee both as a percentage of the Fund's assets and as an annual aggregate amount. The materials also estimated the amount that would be paid to MLAM by the end of the calendar year.[28]

Against these revenues, the proxy statements noted that the agreement

> obligates the Investment Adviser to provide investment advisory services, to furnish administrative services, office space and facilities for management of the [Fund's] affairs, to pay all compensation of officers of the [Fund] as well as Trustees of the [Fund] who are affiliated persons of Merrill Lynch & Co., Inc. or its subsidiaries, and to bear the cost and expenses of advertising of the [Fund].

The aggregate amount of MLAM's expenses was not set forth in the proxy statements, which is not surprising since the proper way in which to take account of these costs was a hotly debated topic during this period. Moreover, the statements did not advise the shareholders (as the Trustees were advised) that the costs to MLPF&S of processing Fund orders and servicing accounts might properly be weighed in considering the fairness of the fee agreement.

The shareholders of the Fund would not have been likely to have changed their votes if additional information regarding those costs had been included. Such information could only have strengthened the evidence of the fairness of the fee. It was not a breach of fiduciary duty for the proxy statements to understate Merrill Lynch's case.

Each of the proxy statements referred to above reported to the shareholders that the Trustees had approved the continuance of the Investment Advisory Agreement for a period of one year and that:

> In their consideration of this matter, the Trustees considered the extensive information relating to, among other things, alternatives to the MLAM arrangements, the [quality], extent and value of the services provided to the Trust by MLAM and its affiliates (including Merrill Lynch), comparative data with respect to the advisory and management fees paid by similar [other money market] funds, the operating expenses and expense ratio of the Trust as compared to similar [such] funds, the performance of the Trust as compared to the performance of similar [other money market] funds and data relating to the costs incurred by MLAM and its affiliates in providing advisory, administrative, processing and other services to the Trust and its shareholders.

In sum, since the Investment Company Act contemplates that the primary responsibility for ascertaining the most significant matters is laid on the Trustees, *Burks v. Lasker*, 441 U.S. 471, 484–85, 99 S.Ct. 1831, 1840–41, 60 L.Ed.2d 404 (1979), the approvals by the shareholders are to be noted in this review of compensation accepted by MLAM, but no significant weight is needed therefrom to vindicate the fairness of the compensation.

*The Attempted Expansion of Issues*

The complaints in these suits allege but one cause of action—a claim for breach of fiduciary duty under Section 36(b) of the Act, 15 U.S.C. § 80a–35(b) (1976). In a diversionary belated attempt, Andre had

---

alleges, in addition, that the [Fund] has borne certain expenses that should have been borne by MLAM, that the growth of the net assets of the [Fund] has damaged the [Fund] by making it difficult or impossible for the [Fund] to take advantage of short-term changes in interest rates and that the July 30, 1979 proxy statement sent by MLAM to shareholders of the [Fund] misrepresented to shareholders the benefits to them of economies of scale and failed adequately to disclose the costs of MLAM incurred with respect to the [Fund], thus rendering null and void the approval by the shareholders on September 14, 1979 of the present investment advisory contract. Both complaints seek the return to the [Fund] of the allegedly excessive advisory fees paid to the Investment Adviser and one seeks, in addition, to enjoin the [Fund] and the Investment Adviser from continuing the allegedly unlawful conduct.

28. The estimate for 1980 was $33 million, only $98,456 less than the actual amount paid. The estimate for 1981 is $47.6 million.

sought to suggest additional claims herein after the plaintiffs had rested. We shall deal with them only for the sake of completeness, albeit they were dismissed at the close of the case as lacking merit, not asserted and not proved.

■ MLPF&S does not furnish any advisory services to the Fund regarding the investment of its portfolio. Section 15(a) of the Act, 15 U.S.C. § 80a–15(a) (1976), calling for a written contract between an adviser and a fund is therefore inapplicable to MLPF&S. *See Teachers Association Mutual Fund of California, Inc.,* [1971–1972] Fed. Sec.L.Rep. ¶ 78,582 (S.E.C. 1971) (no action letter).

■ MLPF&S is not a "principal underwriter" as defined by Section 2(a)(29) of the Act, 15 U.S.C. § 80a–2(a)(29) (1976), and is not obligated to act in its processing function pursuant to a written contract with the Fund. A dealer who makes purchases from an open-end fund through a principal underwriter acting as agent for the fund is not included in the statutory definition of a principal underwriter. Consequently, the contract requirement of Section 15(b) of the Act, 15 U.S.C. § 80a–15(b) (1976), does not apply to MLPF&S.

It is clear on the face of the definitional statute that MLPF&S cannot qualify as a principal underwriter and thus is not subject to Section 15(b). There is no privity of contract between the Fund and MLPF&S which would make MLPF&S a principal underwriter of the shares of the Fund. The only entity in direct privity of contract with the Fund for the purpose of selling its shares is MLFD, which is the Fund's principal underwriter.

The Distribution Agreement with the Fund, an agreement which complies with Section 15(b), describes and appoints MLFD specifically as "the exclusive representative of the Trust to act as principal underwriter," with exceptions not relevant here. The Distribution Agreement gives MLFD the right to have shares of the Fund "re-sold" by its securities dealers, of whom MLPF&S is one, as noted previously. Although

MLPF&S sells shares to the public it does not purchase or have the right to purchase them directly from the Fund. It purchases shares through MLFD as agent for the Fund. The system used by the Fund was clearly and correctly explained at trial by Mr. Edgar M. Masinter, counsel for the independent Trustees, and has long been typical in the mutual fund industry. *See United States v. National Association of Securities Dealers Inc.,* 422 U.S. 694, 698–99, 706, 95 S.Ct. 2427, 2432–33, 2436, 45 L.Ed.2d 486 (1975); *Report [by the S.E.C.] on the Public Policy Implications of Investment Company Growth,* H.R.Rep. No.2337, 89th Cong., 2d Sess. 9, 54–56 (1966).

MLAM has, as heretofore found, satisfied its duty to furnish such information as was reasonably necessary for the Trustees to evaluate the terms of the advisory contract and has thus satisfied Section 15(c) of the Act, 15 U.S.C. § 80a–15(c) (1976).

Andre's claim that misleading and insufficient materials were disseminated to shareholders of the Fund in violation of Section 20(a) of the Act, 15 U.S.C. § 80a–20(a) (1976) is the product of a fertile imagination. Rule 20a–1, 17 C.F.R. § 270.20a–1 (1981), promulgated by the SEC under the authority of that section, adopts the requirements of Rule 14a–9, authorized by the Securities Exchange Act of 1934. That Rule forbids solicitation by means of any proxy statement "which omits to state any material fact necessary to make the statements therein not false or misleading ..." 17 C.F.R. § 240.14a–9 (1981). As the Supreme Court has stated:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

As already mentioned, since shareholder votes would not have been affected by details of costs, none of the points made involve material matter for purposes of this kind of case and the disclosure was ample in view of the burden placed on and satisfied by the Trustees.

In any event, Sections 15(b), 15(c) and 20(a) of the Act were not intended to and do not establish a private right of action in the context of a claim such as here for recovery of compensation under Section 36(b). The structure of the Act makes clear that no private remedies other than Section 36(b) seeking restitution of advisory fees shall be implied, brought or maintained and no other relief shall be granted against the recipient of the payments made. Section 36(b) affords the complete remedy intended by Congress. "Congress amended the Investment Company Act in 1970 to create a *narrowly circumscribed right or [sic] action* for damages against investment advisers to registered investment companies." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 22–23 n.13, 100 S.Ct. 242, 248– 49 n.13, 62 L.Ed.2d 146 (1979) (Emphasis supplied).

Contrasting the question here from that of recapturing brokerage commissions, Judge Friendly has recently indicated in *Fogel v. Chestnutt*, 668 F.2d 100, 112 (2d Cir. 1981) (Fogel II): "We might agree . . . that § 36(b), with the severe limitation of subsection (3), constitutes the *exclusive remedy* insofar as a private claim alleges solely that compensation of an adviser *subsequent to June 14, 1972*, the effective date of § 36(b), is so excessive in the sense of surpassing any reasonable relation to the services rendered that its payment is a breach of fiduciary duty". (Emphasis supplied).

The latterly constructed claims have no merit.

*Perspective*

Money market shareholders hold the key to the continuance of the Adviser in charge of their funds. They can terminate the relationship simply by writing a check and redeeming at once. This is the strongest kind of bargaining power against compensation that is improper. Each year has brought into the market place a new crop of funds with their compensation levels to choose from. The price charged by advisers to those funds establishes the free and open market level for fiduciary compensation. The shareholder can without cost to himself or any other disadvantage deal with numerous suitable others in the market place freely and voluntarily. *See* Frankel, *Money Market Funds*, 14 Rev.Sec.Reg. 913, 918 (1981).

Under our political system no ceilings have been placed on making money except in regulated, public utility areas. In the circumstances presented by this case, the control of fiduciaries by courts requires of them fairness, openness and good faith; not the leveling of the monetary rewards of an entrepreneurial activity. The market price—freely available and competitively set—serves as a standard to test the fairness of the investment advisory fee under the facts shown in this record.

*Conclusions*

A money market fund is not a public utility. It does not obtain an exclusive territory in which to operate. It provides, at its own risk, in a market freely available to unlimited competitors, the services of organizing and pooling small amounts to produce the advantages received by the shareholders, including the ability to deposit and withdraw funds without cost, providing only that withdrawal checks be $500 or over.

The money market fund industry is a highly competitive business. There is no monopoly. There is no limited entry. There has been ample disclosure by the Adviser of the rate of fees to prospective customers, shareholders, the Fund and its Trustees.

How much is too much to compensate such services and facilities? To date there has never been an introduction in the economic system of this country of the concept of profit regulation in a non-utility busi-

ness, which is neither a protected industry, nor exempt from the antitrust laws. In such businesses reliance is placed on the normal forces of the economic system for rate control.

The issue of fair compensation becomes ultimately a social or philosophical—and hence a legislative question—when the fee is in harmony with the broad and prevailing market choice available to the investor, the price being paid is disclosed and the services are satisfactorily performed and sufficient disclosure of the scope of the enterprise, its requirements and performance is made to the Fund's directors and investors. As Mr. Justice Collins appositely wrote many years ago in *Heller v. Boylan*, 29 N.Y.S.2d 653, 669 (Sup.Ct.), *aff'd*, 263 App.Div. 815, 32 N.Y.S.2d 131 (1st Dep't 1941): "[T]he particular business before this Court is not the revamping of the social or economic order." There would seem to be no sense to seek to limit by judicial fiat what is satisfactorily performed, sufficiently disclosed and freely available elsewhere in the market place at comparable charges, without penalties or restraint.

The Adviser is expected to supply either by itself or import the requisite investment, administrative and processing services. The greater the demand that there is for these services because of the volume of orders that accompany the proliferation of shareholder accounts, the larger and costlier must be the facilities made available to cope with them. MLAM has shared with the Fund those economies of scale that it has realized from the Fund's growth in size.

The huge cost of processing large quantities of customer orders in the redemption and deposit services offered to shareholders cannot be reasonably ignored. Nor could fiduciary obligation rationally be required to overlook the unavoidable costs of reducing gross revenues to net profitability therefrom. If the Adviser is to act as an independent contractor and not a mere employee, a sense of reality requires that the compensation to be judged be reduced to its net benefit after all costs incurred in supplying the services required.

 Based on the rate of payment alone, the rate of compensation received by the Adviser herein is neither extraordinary nor uncommon but is a commercially realistic rate. The compensation paid by the Fund is high as a matter of numbers but the payment is lawful relative to the gargantuan size of the Fund. The fees bear a fair relation to the subject matter from which they are derived. There is no "shocking disparity" between the fees paid when compared to compensation to other persons or firms performing the same kind of services in a comparable situation. The diminution in cost factor from increased size is not applicable to the year under review or, if it is, it is insignificant in view of the burdens of scale that have been demonstrated rather than the theoretical economies of scale of which there is no evidence.

The plaintiffs have not sustained their burden of proof of establishing under governing legal standards that the fees received should be characterized as a breach of fiduciary duty. .

The complaints are dismissed, on the merits.

The foregoing shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

SO ORDERED.