Richard MEYER, as custodian for Pamela Meyer, Plaintiff,

v.

OPPENHEIMER MANAGEMENT CORP., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., The Management Group, Inc., and Daily Cash Accumulation Fund, Inc., Defendants.

Richard MEYER, as custodian for Pamela Meyer, Plaintiff,

v.

OPPENHEIMER MANAGEMENT CORP., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppenheimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., J.C. Bradford & Co., Bateman Eichler, Hill Richards, Inc., Centennial Capital Corp., and Daily Cash Accumulation Fund, Inc., Defendants.

Nos. 80 Civ. 397 (ADS), 82 Civ. 2120 (ADS).

United States District Court, S.D. New York.

Oct. 21, 1984.

---

Mordecai Rosenfeld, New York City, for plaintiff.

Guggenheimer & Untermeyer, New York City, for defendants Oppenheimer Management Corp., Oppenheimer Asset Management Corp., Oppenheimer & Co., Oppen-

heimer Holdings, Inc., A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., J.C. Bradford & Co., Bateman Eichler, Hill Richards, Inc., and Centennial Capital Corp.; Alfred Berman, Robert E. Smith, Alan I. Raylesberg, Jeffrey R. Zuckerman, of counsel.

Gordon, Hurwitz, Butowsky, Weitzen, Shalov & Wein, New York City, Neef, Swanson, Myer & Clark, Denver, Colo., for defendant Daily Cash Accumulation Fund, Inc.; David M. Butowsky, Clarence Otis, Jr., New York City, Rendle Myer, Robert Swanson, Denver, Colo., of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Both of the cases before this court concern the legality of a decision by defendant Daily Cash Accumulation Fund, Inc. ("the Fund"), a money-market mutual fund, to adopt a Plan of Distribution pursuant to Rule 12b–1, 17 C.F.R. § 270.12b–1 (1984) ("the Plan"). The Plan allows the Fund to reimburse certain securities dealers for administrative and sales-related costs in rendering distribution assistance to the Fund. Plan ¶ 2 (1982 Fund Proxy Statement, Exh. A, at 19 (Mar. 25, 1982)). Plaintiff, a stockholder of the Fund, has challenged the legality of the Plan. For the reasons set out below, the Plan's legality is upheld.

### I. Background.

Two factors render complicated this determination—the relationship among the ten defendants and the prior litigation between the parties. Defendant Oppenheimer & Company owns nearly all of the stock of defendant Oppenheimer Holdings Company, which in turn owns virtually all of the stock of defendant Oppenheimer Management Corp. Oppenheimer Management Corp. owns all of the stock of defendant Oppenheimer Asset Management Corp. (collectively "the Oppenheimer defendants.") At the times relevant to these cases, Oppenheimer Asset Management Corp. owned a majority of the stock of defendant Centennial Capital Corp.

("CCC," formerly THE Management Group). CCC is the investment adviser to the Fund. The other four defendants—A.G. Edwards & Sons, Inc., Thomson McKinnon Securities, Inc., Bateman Eichler, Hill Richards, Inc., and J.C. Bradford & Co. (collectively "the brokerage defendants")—own the remaining stock of CCC. In addition, their clients own over ninety percent of the shares of the Fund. The brokerage defendants exercise substantial influence over their clients' decision to use the Fund as an investment vehicle.

The brokerage defendants play two roles. First, as the owners of CCC, they have an interest in maximizing CCC's profitability, since this will maximize their own income. Second, as agents for their individual clients, they have a duty to serve their clients' interests by maximizing the net return on investments in the Fund. Although an obvious potential for conflicts of interest exists in such a situation, similar relationships are prevalent throughout the money-market fund and brokerage industries.

In 1980, the plaintiff in these actions filed a stockholder derivative action against the Fund, the Oppenheimer defendants, the investment adviser (CCC was then called THE Management Group, Inc.), and two of the brokerage defendants, A.G. Edwards and Thomson McKinnon. *Meyer v. Oppenheimer Management Corp. et al.*, No. 80 Civ. 397 (*Meyer I*). That suit alleged that the management fee charged by the investment adviser pursuant to its agreement with the Fund was excessive and therefore that the non-Fund defendants had violated section 36(b) of the Investment Company Act of 1940 ("ICA") as amended, 15 U.S.C. § 80a–35(b) (1982), which imposes a fiduciary duty on an investment adviser with respect to the receipt of compensation for services. At the time suit was filed, the adviser charged the Fund a constant percentage of the Fund's net assets.

At roughly the time *Meyer I* was filed, CCC and the Fund agreed to a new compensation scheme under which the management fee was to consist of decreasing per-

centages of the Fund's net assets as the Fund's assets increased. Following the commencement of the action, CCC and the Fund agreed to a further reduction of the management fee. After extensive discovery, *Meyer I* was settled in 1981. At that time, the fee schedule was reduced even further. In the Stipulation of Settlement, the parties agreed, among other things, that CCC would "perform and offer to continue to perform all of the investment advisory services specified or required by the terms of the Advisory Agreement currently in effect between [CCC] and the Fund...." Stipulation of Settlement at 5 (June 16, 1981). The stipulation also provided that the Advisory Agreement could not be modified in any way that would "reduce the categories of service or expense guaranty undertaken by [CCC] pursuant to the terms of the current Advisory Agreement." *Id.* at 7.

Both sides were aware that the brokerage defendants, who owned CCC, also performed significant services for the Fund without compensation. *See, e.g.,* Defendants' Memorandum in Support of Proposed Settlement, *Meyer I,* at 20 (Aug. 5, 1981) ("defendants Edwards and Thomson ... administer their own customers' accounts at a total savings to the Fund of between $2 million and $3 million per year [and] .... also save the Fund 'in excess of probably $50,000 a month in postage alone' by incorporating the Fund's monthly dividend statements in [their own] account statements"); Affidavit of Mordecai Rosenfeld ¶ 13 (July 31, 1981) (affidavit in support of proposed settlement filed by plaintiff's counsel) (noting that "the very substantial costs of keeping all shareholder accounts current, ... sending monthly statements, and responding to all shareholder inquiries .... are borne, not by the Fund, but by the brokerage firms that own the Adviser"). Nevertheless, nowhere in the stipulation is there any mention of a duty on the part of the brokerage defendants to continue performing these services. The only party which was required by the settlement to perform any services was CCC.

During the year following the settlement in *Meyer I,* the Fund included a proposal to adopt a Rule 12b–1 distribution plan in proxy materials for its annual stockholders' meeting. All of the Fund's independent directors had voted in favor of the Plan at a Board meeting held on February 23, 1982. The Plan would authorize CCC to enter into agreements with securities dealers under which the Fund would reimburse these dealers for administrative and sales-related costs incurred in rendering distribution assistance to the Fund. The Plan placed a number of restrictions on the Fund's ability to enter into such plans and provide reimbursement of expenses. The most significant of these was a cap placed on the amount of reimbursement—it was limited to the lesser of (1) the actual costs incurred by a dealer or (2) two-tenths of one percent of the average net asset value of the shares held by the broker's clients in broker-administered accounts.

The proxy statement explained that the Fund's primary motivation for adopting the Plan was to maintain its position in a competitive field. Other money-market funds had enacted Rule 12b–1 plans to reimburse securities dealers for their fund-related costs, and the directors believed that, unless the Plan were adopted, the brokerage firms that used the Fund for their administered accounts would switch these accounts to funds that provided distribution payments.

Following adoption of the Plan at the 1982 annual meeting, the plaintiff in *Meyer I* filed the present action, another stockholder derivative suit against the Fund, the Oppenheimer defendants, and all four of the brokerage defendants. *Meyer v. Oppenheimer Management Corp. et al.,* No. 82 Civ. 2120 (*Meyer II*). This suit alleges that the Plan violates the Stipulation of Settlement in *Meyer I,* since the management fee agreed to as part of the settlement was meant to include all the costs incurred by the brokerage firms in administering Fund accounts. In addition, the complaint in *Meyer II* alleges violations of sections 36(b) and 48 of the ICA, 15 U.S.C. §§ 80a–35(b) and 80a–47(a) (1982), because

the management fee is excessive (and therefore a breach of the non-Fund defendants' fiduciary duty) if it covers only investment advice. Plaintiff also claims that the Fund violated section 14(a) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78n(a) (1982) and section 20 of the ICA, 15 U.S.C. § 80a–20 (1982), because the proxy statement fails to state that the management fee paid by the Fund to CCC was meant to include the expenses for which the Plan would reimburse brokers. Finally, the complaint alleges that defendants had violated section 15 of the ICA, 15 U.S.C. § 80a–15 (1982), in connection with the sale of two of the Oppenheimer defendants; as a result of that sale, control of CCC would change and the "undue burden" placed on the Fund by the Plan would affect the price of that sale. (That sale was in fact consummated.)

On July 30, 1982, defendants moved to dismiss the complaint in *Meyer II*, on the grounds both that it failed to state a legally cognizable claim and that plaintiff had failed to make a demand upon the Fund's directors pursuant to Fed.R.Civ.P. 23.1. At a hearing on October 15, 1982, the court dismissed plaintiff's section 15 claim, since the court's decision on the breach of settlement and section 36(b) claims would effectively render the section 15 claims nugatory. Transcript of October 15, 1982 hearing at 4–5, 19. The court also held that plaintiff had an obligation to present his demand to the Fund's Board, both because of Rule 23.1 and because of plaintiff's counsel's responsibilities as an officer of the court in enforcing the settlement in *Meyer I*. Transcript at 8–10. The court ordered that the case be put on the suspense docket pending the outcome of plaintiff's demands upon the Fund's Board. Transcript at 19. Finally, the court made clear that "the proper way to treat this case if it comes back [from the suspense docket] will be as a motion to enforce the settlement...." *Id.*

Plaintiff then served his demands upon the Fund's Board. Barely one month later, on December 10, 1982, plaintiff moved to restore *Meyer II* to the active calendar and to enforce the settlement in *Meyer I*. Defendants opposed restoring the case, both because the settlement had not been violated and because the Board had not yet had sufficient time to respond to plaintiff's demand letter. The court denied that motion on February 9, 1983, and ruled that the case would be restored no later than May 1, 1983, by which time the Fund's Board would have had "a reasonable opportunity to evaluate and respond to plaintiff's demands." On April 27, 1983, the Fund responded to plaintiff's letter. It informed plaintiff that "[t]he Board has unanimously concluded that your contentions are without merit and your demands must properly be rejected in the interest of the Fund and its shareholders" (Defendants' Second Motion to Dismiss, Exh. 2, at 1). In May 1983, plaintiff served a demand for production of documents on the defendants. On June 27, 1983, defendants again moved to dismiss *Meyer II*. It is this second motion to dismiss which is now before the court.

*Meyer II* raises two questions. First, did enactment of the Rule 12b–1 Distribution Plan violate the settlement agreement in *Meyer I?* Second, assuming that the Plan does not violate *Meyer I*, does the Plan violate section 36? For the reasons given below, the answer to both questions must be negative. Neither the language and spirit of *Meyer I* nor the legal requirements of section 36 is violated by the Fund's payment of distribution expenses.

## II. The Settlement in Meyer I.

■ "Since a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *see Ashare v. Brill*, 560 F.Supp. 18, 21 (S.D.N.Y.1983) (approving use of "a contract analysis" to examine settlement of shareholder derivative action against money-market fund). One of these contractual principles is that "the scope of a consent decree must be discerned within its four

corners, and not by reference to what might satisfy the purposes of one of the parties to it.... [T]he instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *see Hart Schaffner & Marx v. Alexander's Department Stores, Inc.*, 341 F.2d 101, 102 (2d Cir.1965) (per curiam) ("consent decrees 'are to be read within their four corners, and especially so ... because they represent the agreement of the parties, and not the independent examination of the subject-matter by the court' "). Thus, the language of the stipulation of settlement in *Meyer I* must be read narrowly; only if the language is ambiguous do the broader purposes of the agreement become relevant. *See United States v. Olin Ski Co.*, 503 F.Supp. 141, 143 (S.D.N.Y.1980).

■ The *Meyer I* stipulation provides that "all claims asserted or which might have been asserted on the basis of any and all of the matters and transactions alleged by the complaint and the amended and supplementary complaint herein be dismissed with prejudice on the merits and that judgment be entered in favor of all defendants, upon the following terms and conditions." Stipulation at 5. Two provisions of the stipulation are relevant to the question raised in *Meyer II.* The first condition provides that:

> From and after the Effective Date of this Stipulation, as hereinafter defined, and for the period hereinafter specified, Centennial will perform and offer to continue to perform all of the investment advisory services specified or required by the terms of the Advisory Agreement currently in effect between Centennial and the Fund, for a management fee to be computed in the manner contemplated by the current Advisory Agreement as a percentage of the average daily net asset value of the Fund based on the following Schedule....

Stipulation at 5. The fourth condition provides that:

> Nothing herein contained shall be deemed to provide or imply that, except in respect to the maximum scale of management fees as provided in the Revised Management Fee Rate Schedule, the terms of the Advisory Agreement presently or hereafter in effect between the Fund and Centennial may not be varied, modified or amended provided that no such variance, modification or amendment shall reduce the categories of service or expense guaranty undertaken by Centennial pursuant to the terms of the current Advisory Agreement.

*Id.* at 7.

Two things about the language of the stipulation, which allowed judgment to be entered in favor of *all* the defendants, must be noted. First, the only defendant whose duties are spelled out in the agreement is CCC. None of the services performed by either the Oppenheimer or the brokerage defendants is mentioned. Second, the stipulation refers explicitly to CCC's duties under the Investment Advisory Agreement alone.

Plaintiff argues that the management fee agreed to in the settlement "was meant to include [payment for] the very services for which the new Administration Fee [i.e., distribution payments under the Plan] has now been been imposed." Plaintiff's Answering Memorandum of Law at 4 (Aug. 1, 1983). In support of his contentions, plaintiff relies primarily upon statements made by both parties at the time the settlement agreement in *Meyer I* was submitted to the court for approval. In the affidavit which he submitted in favor of the settlement, plaintiff's counsel stated:

> 13. The management fee is, we note, not only for portfolio advice, but includes the very substantial costs of keeping all shareholder accounts current (reflecting all transactions), sending monthly statements, and responding to all shareholder inquires [*sic* ]. It is estimated that those administrative costs actually run be-

tween $2–$3 million per year (See deposition of James C. Swain, Exhibit B. at p. 85).

We should note that those costs are borne, not by the Fund, but by the brokerage firms that own the Adviser (A.G. Edwards & Sons and Thomas [*sic*] McKinnon originally; now includes two other firms Bateman Eichler Sutro of San Francisco and J.C. Bradford of Nashville, Tennessee). Customers of those four firms represent between 90 and 95% of the Fund's shareholders (Deposition of Swain, Exhibit B., at p. 22).

(quoted in Plaintiff's Motion To Restore *Meyer II* to the Active Calendar and To Enforce the Stipulation of Settlement in *Meyer I*, at 4 (Dec. 9, 1982)). Plaintiff argues that defendants implicitly agreed with plaintiff's characterization of the advisory fee by remaining silent in the face of this affidavit. He further argues that defendants supported this interpretation by stating both that "Centennial also provides a number of services to the Fund not normally provided by investment advisers," and that "[i]n addition, defendants Edwards and Thomson, whose customers represent approximately 80% of the Fund's beneficial shareholders, administer their own customers' accounts at a total savings to the Fund of between $2 million and $3 million per year." Defendants' Memorandum in Support of Proposed Settlement, *Meyer I*, at 20 (Aug. 5, 1981).

Plaintiff's contentions are unpersuasive for three reasons. First, when the terms of a written settlement agreement are clear and unambiguous, resort to statements outside the agreement is impermissible. Second, when read closely, neither statement supports plaintiff's argument that CCC was ever viewed as having borne the administrative costs of the Fund. Third, even if plaintiff is correct in claiming that CCC did bear the Fund's administrative expenses at the time of the *Meyer I* settlement, those expenses were not borne in connection with the Investment Advisory Agreement; the settlement agreement therefore did not require that CCC and the brokerage defendants continue to bear them.

While "[t]he Supreme Court has made clear that courts may rely on ... a review of the circumstances surrounding the formation of the consent order without violating the 'four corners' rule," *Olin Ski Co.*, 503 F.Supp. at 144, this does not mean that external documents whose language is materially different from that contained within the actual settlement agreement can be used to expand indiscriminately the scope of a consent decree. *Artvale, Inc. v. Rugby Fabrics Corp.*, 303 F.2d 283, 284 (2d Cir.1962) (per curiam) (rejecting expansive interpretation based on other documents, in part because other documents "show ... that broader terminology was available to the parties had they chosen to use it"); *see United States v. General Adjustment Bureau, Inc.*, 357 F.Supp. 426, 429 (S.D.N.Y. 1973) (*Artvale* standard is consistent with Supreme Court's decision in *Armour*). Moreover, the instant case is distinguishable from *ITT Continental Baking Co.*, where the Supreme Court declined to follow the reasoning used in *Artvale*, 420 U.S. at 238 n. 12, 95 S.Ct. at 935 n. 12. The consent order in *ITT* expressly contained an explanation of the order by the parties and provided that the complaint was to be used to construe the order. *Id.* Here, by contrast, although the court's order mentions both plaintiff's counsel's affidavit and defendants' memorandum, no explicit or implicit resort is made to the terms of those documents for aid in construing the stipulation. Instead, the Order states that "[t]he Stipulation of Settlement ... may be consummated by the parties thereto in accordance with *its* terms...." Final Order and Judgment on Consent at 3 (Aug. 7, 1981) (emphasis added). The terms of the stipulation are noticably silent as to *any* obligation whatsoever on the part of the brokerage or Oppenheimer defendants. The parties certainly were capable of including conditions regarding their performance of particular duties. Their failure to do so cannot be brushed aside, as plaintiff seeks to do here.

Moreover, the two statements to which plaintiff refers support the inference that, at the time of the *Meyer I* settlement, both sides understood that administrative and distribution expenses were not part of CCC's duties. Plaintiff chooses to emphasize his counsel's statement that the management fee included administrative costs, but he ignores the fact that, in the very next sentence of the affidavit, counsel explicitly noted that these costs were borne *"by the brokerage firms* that own the Adviser" (emphasis added). Similarly, defendants' memorandum makes the representation upon which plaintiff relies in a manner that reflects a distinction between the services performed by the brokers and those performed by CCC: "Centennial also provides a number of services.... *In addition, defendants Edwards and Thomson* ... administer their own customers' accounts" (emphasis added). Thus, to the extent that plaintiff looks to counsels' contemporaneous statements, the language in those statements differentiates between services provided to the Fund by CCC itself and those provided by CCC's part-owners, the brokerage firms. Such a differentiation makes good sense: at the time *Meyer I* was settled, over half of CCC's stock was owned by Oppenheimer Asset Management Corp. Evidently, none of the Oppenheimer defendants had individual clients who used the Fund as an investment vehicle. Thus, although the Oppenheimer defendants, through Oppenheimer Asset Management Corp.'s majority ownership in CCC, might have investment advisory duties under the settlement agreement, they could have no administrative obligations with regard to individual Fund accounts.

No doubt plaintiff now views the purpose of the settlement agreement in *Meyer I* as having been to fix the total amount of compensation the brokerage defendants could obtain in regard to Fund accounts, either through payments directly to them or through payments to CCC. But as the Supreme Court noted in *Armour:*

> [T]he agreement reached [in a consent order] normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation.... [T]he resultant decree embodies as much of th[eir] opposing purposes as the respective parties have the bargaining power and skill to achieve.

402 U.S. at 681–82, 91 S.Ct. at 1757.

Moreover, plaintiff might in fact have done no better in achieving his objective after a trial. Plaintiff now seeks to pierce the corporate structure of CCC and the brokerage defendants. Had he succeeded in doing so at trial, however, he might well have failed to win any reduction in the investment advisory fee at all, since a court would probably have concluded that the fee was reasonable in light of the non-investment advisory services (i.e., administrative and distribution costs) provided without compensation by affiliated persons of the investment adviser. In *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 528 F.Supp. 1038 (S.D.N.Y.1981), *aff'd,* 694 F.2d 923 (2d Cir.1982), *cert. denied,* 461 U.S. 906, 103 S.Ct. 1877, 76 L.Ed.2d 808 (1983), Judge Pollack dismissed the complaint for precisely this reason:

> Nothing in Section 36(b) obligates this Court, in assessing the fairness of the investment advisory compensation, to restrict its vision only to those services performed directly by [the investment adviser]. Indeed, the statute recognizes that in order to properly assess the fairness of advisory compensation, the courts cannot be strictly bound by corporate structure and ignore closely related entities whose functions intimately impinge on one another. The statute itself speaks of payment for the services of the advisor "or any affiliated person of such investment adviser." 15 U.S.C.Sec. 80a–35(b) (1976). As both the Senate and House Reports stated:
>
> > [i]t is intended that the court look at all the facts in connection with the determination and receipt of such compensation, *including all services rendered to the fund or its shareholders* and all compensation and payments received,

in order to reach a decision as to whether the adviser has properly acted as fiduciary in relation to such compensation. *Senate Report* at 15; *House Report* at 37, U.S.Code Cong. & Admin.News 1970, p. 4910.

That the courts are not required blindly to adhere to corporate organization when there is no reason to do so also follows from the equitable nature of their task under Section 36(b).

528 F.Supp. at 1049 (emphasis in *Gartenberg*). In affirming the dismissal of plaintiff's complaint, the Second Circuit explicitly confirmed that the "theory that only the administrative costs incurred by the [investment adviser] itself may be considered" was "erroneous" and "exalt[s] form over substance...." 694 F.2d at 931.

Of course, this is not to say that in *Meyer I,* this court would have treated the brokerage defendants and CCC as a single entity in assessing the legality of the advisory fee. What a court would have done is irrelevant in construing a settlement agreement. Both sides willingly waived their right to a full adjudication of their claims. Plaintiff cannot now press his claims in their most expansive form when he settled for less three years ago.

By contrast, the brokerage defendants' purpose at all times may be viewed as maximizing their profits, through income derived from CCC, payments received directly from the Fund, and other sources. In fact, the Fund was led to propose the 12b–1 Plan at issue here because the brokers threatened to move their administered accounts to funds which would reimburse them for distribution expenses. If the Fund had acceded to plaintiff's demand, had declined to enact a 12b–1 Plan, and the brokerage defendants had then switched their administered accounts to another fund, plaintiff could not complain that the switch violated the settlement agreement, even though the effect that such behavior would have had on the ninety percent of the Fund's shareholders with broker-administered accounts would be identical, namely, their net yield on money-market invest-ments would be reduced by the amount paid to brokers. That the defendants seek to maximize their profits cannot, by itself, render their behavior a violation of *Meyer I.*

Thus, all of plaintiff's arguments that rely on matters not explicitly contained within the Stipulation of Settlement itself must be rejected. It remains to consider what the Stipulation itself requires of defendants.

The stipulation says little about the actual duties required of CCC. To the extent that the Stipulation standing alone describes CCC's obligations, it refers to them as "investment advisory services." Stipulation at 5. The reasonable interpretation of this term is clear: the duties covered by the settlement were connected to the Fund's decisions on how to invest its assets and the execution of those decisions. Neither "investment" nor "advisory" should be taken to encompass the predominantly clerical services connected with informing shareholders about their account balances.

This conclusion is buttressed by the stipulation's repeated references to the Investment Advisory Agreement ("Agreement") then existing between THE Management Group and the Fund. (That agreement appears as an exhibit to both of defendants' motions to dismiss *Meyer II*—as Exhibit 4 to the first motion and as Exhibit 5 to the second.) The only provision of the Agreement upon which plaintiff relies is paragraph 2, which states that "[t]he Management Company [CCC] agrees to assist in the general management and supervision of the business and affairs of the Fund." This provision is noticeably silent as to whether assistance is meant to include any financial obligation. The general tenor of the language suggests that it does not. Management and supervision of the Fund is different from administration of shareholders' accounts, the subject with which *Meyer I* and *Meyer II* are concerned.

Moreover, more detailed portions of the Agreement explicitly limit the obligations of CCC, and therefore, by plaintiff's own logic, the obligations of its owners, the

brokerage defendants. Paragraph 6, for example, states: "It is agreed that the services to be performed by the Management Company hereunder shall not include any specialized services not capable of rendition by the regular personnel of the Management Company." It was clear at the time of the *Meyer I* settlement that brokerage personnel and a separate transfer agent, SSI, were used to carry out administrative functions. Whatever the relationship of CCC and the brokerage *firms,* the *employees* performing the services at question here worked for the brokers, not CCC.

For present purposes, the most significant provision of the Agreement is paragraph 7:

> The Fund will pay all expenses not specifically assumed by the Management Company hereunder, *including* the fees and expenses of those directors of the Fund who are not officers and directors of the Management Company, interest expenses, taxes, brokerage fees and commissions, and *those fees and expenses outlined in any Distribution Agreement.*

(emphasis added). This provision limits the scope of the one contractual provision upon which plaintiff relies. In addition, it shows that, at the time *Meyer I* was settled, the Fund possessed the power to enter into distribution agreements and that, if it did, the Fund (and not CCC or any other entity) would be responsible for any payments pursuant to such agreements. That the Fund had not exercised this power before the settlement does not render plaintiff's failure to prevent its exercise after the settlement an oversight which this court should correct under the guise of enforcing the parties' agreement.

Under the Investment Advisory Agreement, therefore, CCC had no responsibility to perform or pay for the distribution of share funds. Any obligations it might have had in connection with distribution were contained in a wholly separate agreement—the General Distribution Agreement between the Fund and THE Management

Group, dated December 3, 1979. (This agreement is appended to defendants' first motion to dismiss as Exhibit 6.) Like the Investment Advisory Agreement, this contract was between the Fund and the adviser alone; the brokerage firms and the Oppenheimer corporations were neither parties to the contract nor mentioned in it. CCC neither undertook to perform its current distribution obligations nor promised to perform new ones when it entered into the *Meyer I* settlement. The *Meyer I* stipulation's repeated references to one agreement and the duties of one of the defendants cannot be read to incorporate the second agreement or impose duties on the other defendants. Plaintiff therefore cannot seek to void the Fund's 12b–1 Plan on the grounds that it violates the settlement in *Meyer I.*

### III. Legitimacy of the Fund's 12b–1 Plan.

Plaintiff also claims that, even if the settlement does not prohibit the Fund from enacting a distribution plan, the Fund's Plan violates section 36(b) of the ICA. This claim is also rejected.

The Fund's Plan was established pursuant to Rule 12b–1. 17 C.F.R. § 270.12b–1 (1984). Companies such as the Fund are prohibited from distributing securities of which they are the issuer except pursuant to a 12b–1 plan. Rule 12b–1 defines "distributing" as

> engag[ing] directly or indirectly in financing any activity which is primarily intended to result in the sale of shares issued by such company, including, but not necessarily limited to, advertising, compensation of underwriters, dealers, and sales personnel, the printing and mailing of prospectuses to other than current shareholders, and the printing and mailing of sales literature.

17 C.F.R. § 270.12b–1(a)(2) (1984). The rule further provides that a company may implement or continue a distribution plan "only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable busi-

ness judgment and in light of their fiduciary duties under ... sections 36(a) and (b) [of the ICA] ... that there is a reasonable likelihood that the plan will benefit the company and its shareholders...." *Id.* § 270.12b–1(e).

Section 36(b) creates "a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by [a] registered investment company or by the security holders thereof, to [an] investment adviser or any affiliated person of such investment adviser." 15 U.S.C. § 80a–35(b) (1982). This fiduciary duty is enforceable in a private action by a shareholder against both the investment adviser and any affiliated person of the investment adviser. The brokerage defendants are affiliated persons of CCC. *See* 15 U.S.C. § 80a–2(a)(3) (1982).

Read broadly, Plaintiff's complaint presents three theories of how the Fund's 12b–1 Plan violates section 36. (All three claims at bottom charge that the fees paid under the Plan are excessive or unnecessary.) First, he claims that the expenses involved are already covered by the management fee which the Fund pays to CCC. Second, although he does not allege any such violation in the amended complaint, he argues that the Plan violates Rule 12b–1 because it pays for costs other than distribution expenses, namely, the costs of servicing already existing accounts. Third, he claims that the payments are excessive.

Plaintiff's first claim is identical to his claim that the Plan violates the *Meyer I* settlement agreement. That claim has already been rejected. Nothing in any of the documents referred to by plaintiff provides support for plaintiff's claims either that the settlement agreement was intended to cover distribution expenses or that the Investment Advisory Agreement by itself was intended to pertain to such costs. *See supra* Section II.

Plaintiff raised his second claim—a violation of Rule 12b–1 itself—in his demand letter to the Fund's Board of Directors: "[A]lthough not detailed in the complaint, the Plan is defective for the additional reason that it does not comply with Rule 12b1. That Rule permits certain payments by a fund only for expenses that are 'primarily' for the sale of new fund shares, whereas the stated purpose of the Fund's Plan is to maintain old, existing accounts." Letter from Mordecai Rosenfeld to Fund Board of Directors at 1 (Oct. 21, 1982) (reprinted in defendants' second motion to dismiss, Exh. 2). This claim is similarly unpersuasive. The Fund's Plan explicitly states that recipients are to be reimbursed for their "administrative and sales related costs in rendering distribution assistance." (1982 Proxy Statement, Exh. A, ¶ II.) No other expenses are mentioned anywhere in the Plan. Rule 12b–1's definition of "distribution" encompasses a wide variety of payments, including specifically compensation of dealers and sales personnel; the only restriction is that the payments must be "primarily intended to result in the sale of shares...." Plaintiff's reference to the Plan as being designed to maintain already existing accounts misinterprets this provision. Even an already existing account may purchase new shares of the Fund. Presumably, given the nature of the Fund, most of the Fund's shares are bought by current accounts. Nothing in the rule suggests that sales expenses incurred in selling shares to current Fund shareholders must be excluded from a 12b–1 plan. The Fund's Board was correct when it asserted in its reply to plaintiff's demand letter that both "facilitat[ing] and encourag[ing] the sale of Fund shares to new investors" and "facilitat[ing] the sale of more Fund shares to present shareholders" are sufficiently connected to the sale and distribution of Fund shares to make reimbursement proper under Rule 12b–1. Board Letter at 16 (Apr. 27, 1983) (reprinted in defendants' second motion to dismiss, Exh. 2). Plaintiff confuses "new shares" with "new accounts." The rule only requires a relationship between the reimbursed activity and the former. Plaintiff has failed to allege a single fact that might show that the Plan as operated violates the restrictions of Rule 12b–1.

Plaintiff's final claim is that, even assuming that the expenses involved are not covered by the investment advisory agreement and are of the kind for which reimbursement under Rule 12b–1 is proper, the amounts actually reimbursed under the Fund's particular Plan are excessive and that the directors' approval of such a plan violated their duties under Rule 12b–1 and section 36(b). *Burks v. Lasker*, 441 U.S. 471, 484, 99 S.Ct. 1831, 1840, 60 L.Ed.2d 404 (1979), stated in dicta that section 36(b) prevents action by a board of directors from cutting off derivative suits based on section 36 fiduciary duties. Thus, the fact that the Board approved the Fund's Plan and rejected plaintiff's demand letter cannot, by itself, render plaintiff's claims untenable. Nonetheless, section 36(b)(2) does provide that board approval and shareholder ratification "shall be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a–35(b)(2) (1982). In this case, the Board's determination, combined with plaintiff's failure to allege any facts (other than those already rejected in connection with the settlement argument) to suggest that the Board did not fulfill its responsibilities under Rule 12b–1, is sufficient for the court to conclude that plaintiff's complaint should be dismissed.

First, the board of directors which made the decision at issue in this case is unusually independent. Plaintiff himself acknowledged this during the settlement of *Meyer I*. *See* Plaintiff's Memorandum of Law in Support of the Proposed Settlement, *Meyer I*, at 17 (July 31, 1981). Most funds are actually created by their investment advisers and affiliate persons, and therefore are subject to manipulation by these groups. *See* S.Rep. 184, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 4897, 4901. In contrast, the Fund was an existing entity which considered a number of investment advisers before deciding on THE Management Group. *See* Deposition of William H. Baker at 13 (May 14, 1981). In addition, the Fund's Board

had negotiated a reduction of the advisory fee prior to any litigation. Finally, the way the Plan is structured evidences the directors' fulfillment of their fiduciary duties to the Fund. It limits reimbursement to actual distribution-related costs and places a cap on payments regardless of costs. Because this cap is less than the total costs of administering shareholder accounts, the brokerage defendants have continued to absorb a "substantial" part of the Fund's administrative expenses. Board Letter at 9 (Apr. 27, 1983).

Second, the Board's response to plaintiff's demand letter provides adequate evidence to show that the Board could have found a reasonable likelihood that the Plan would benefit the Fund. The Board's letter provides a detailed discussion of changes both in industry practices and in economic conditions that made a distribution plan desirable. The fact that 80 other funds had adopted 12b–1 Plans, and would therefore pay some of the brokerage defendants' expenses should they shift their administered accounts, threatened the Fund with massive redemptions. Those redemptions would have increased the effective rate of the management fee, which is higher at lower asset levels. In addition, because it would force the Fund to sell some securities before the optimal time and would prevent the Fund from investing in some desirable securities, it would also decrease the Fund's gross yield.

Of course, to the extent that individual investors would have to provide their brokers with a certain level of profit either through the Fund's Plan or another fund's distribution payments, the Fund's shareholders would not benefit directly from the Plan. But, as Table II in the 1982 proxy statement and virtually every other statement by any party in this litigation demonstrate, the Fund's investment performance was distinctly above average, and its yield was higher than the average even taking into account the distribution payments. Thus, Fund shareholders would benefit by

having their accounts maintained in the Fund, rather than in another money-market instrument.

The Fund's experience with the Plan in operation, as reflected in the Board's reply to plaintiff's demand letter, also supported its decision to institute a 12b–1 Plan. Plaintiff has alleged no facts to cast doubt on the Board's assessment. His only claim rests on the absolute amount of the aggregate fees paid by the Fund to CCC and the brokerage houses. *See* Amended Complaint ¶ 8. That shareholders might have been able to obtain a better bargain than that which they currently have is not the test under section 36(b). "Instead, plaintiffs can prevail only if this Court finds that [the investment adviser and its affiliated persons] received compensation under an agreement that was *unfair* to the Fund and its shareholders." *Gartenberg*, 528 F.Supp. at 1047 (emphasis in original). Plaintiff has utterly failed to show such unfairness. Indeed, every fact presented to the court suggests that the directors' behavior was wholly in keeping with their fiduciary duties under the ICA.

### IV. Conclusion.

The Plan violates neither the settlement agreement in *Meyer I* nor sections 12(b) and 36(b) of the ICA. Since the distribution payments give rise to no substantive violation, the proposal to enact the plan contained in the 1982 proxy statement did not violate either section 20 of the ICA or section 14(a) of the Securities Exchange Act of 1934. Furthermore, since the payments of distribution expenses do not impose an undue burden upon the Fund, Oppenheimer's sale of its interest in CCC does not violate section 15 of the ICA. Plaintiff's motion to enforce the settlement in *Meyer I*, 80 Civ. 397, by voiding the Fund's 12b–1 plan is therefore denied, and defendants' motion to dismiss the complaint in *Meyer II*, 82 Civ. 2120, is therefore granted. This order closes these cases.

SO ORDERED.